Filed 8/11/11

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S068863 |
| v. | ) | |
| | ) | |
| DAVID LYNN SCOTT III, | ) | |
| | ) | Riverside County |
| Defendant and Appellant. | ) | Super. Ct. No. CR 48638 |
| _____ | ) | |

A jury convicted defendant David Lynn Scott III, of the first degree murder of Brenda Gail Kenny with the personal use of a deadly weapon.[1] It concluded, as special circumstances, that the murder was committed in the course of burglary and rape.[2] Defendant was also convicted of first degree burglary and assault with a deadly weapon[3] on Colleen Cliff, first degree burglary and two rapes of Regina M., first degree burglary and false imprisonment[4] of Regenia Griffin, first degree burglary and two rapes of Julia K., first degree robbery of Joseph C.,[5] attempted

---

[1]   Penal Code sections 187 and 12022, subdivision (b)(1); former section 1192.7, subdivision (c) (23).  Further statutory references are to the Penal Code, unless otherwise specified.

[2]   Sections 459 and former section 261, subdivision (2); former section 190.2, subdivision (a)(17)(vii) and former section 190.2, subdivision (a)(17)(iii).

[3]   Section 245, subdivision (a)(1).

[4]   Section 236.

[5]   Section 211.

murders of Phillip Courtney and Howard Long,[6] and prowling.[7] The jury made the following findings supporting weapon enhancements: personal use of a deadly weapon[8] in the burglary of Colleen Cliff and the robbery of Joseph C.; use of a deadly weapon[9] in the rapes of Regina M. and Julia K.; personal use of a firearm[10] in the burglary and false imprisonment of Regenia Griffin, the robbery of Joseph C., and the attempted murders of Phillip Courtney and Howard Long. The jury found that defendant inflicted great bodily injury[11] upon Phillip Courtney.

Following a deadlock, the court declared a mistrial on four counts arising from two other incidents: burglary, false imprisonment, and kidnapping of Linda Gonzales; and assault with a deadly weapon on Edward Buhr. Before trial, two counts arising from still other incidents had been dismissed pursuant to section 995.

We affirm the judgment.

## I. FACTUAL BACKGROUND

### A. Guilt Phase

#### 1. The Murder of Brenda Gail Kenny

On Thursday, September 10, 1992, Brenda Kenny felt ill. So, instead of going to work at the library, she spent the day visiting her mother. At 10:00 p.m.,

---

[6] Sections 187 and 664.

[7] Former section 647, subdivision (g).

[8] Former section 1192.7, subdivision (c)(23) and section 12022, subdivision (b).

[9] Former section 1192.7, subdivision (c)(23) and section 12022.3

[10] Former section 1192.7, subdivision (c)(8) and section 12022.5, subdivision (a).

[11] Section 12022.7.

Kenny drove to her home in Riverside's Canyon Creek apartment complex. The staircase to Kenny's apartment passed the bedroom window of Joseph Masewicz's apartment, which was directly below hers. That evening, after 10:00 p.m., Masewicz heard two people walking up the stairs. During the night he was awakened by a "bang," as if someone had fallen. He then heard a "cry." His alarm clock read 4:10 a.m. Because Masewicz knew that Kenny was prone to seizures, he got up to check on her. However, when he heard footsteps in her apartment, he concluded nothing was amiss and did not pursue the matter.[12]

Saturday evening Kenny's parents received a phone call from Ruth Hunter. Hunter, a library colleague, was concerned that Kenny had not been at work on Friday and had not called in ill. Mr. and Mrs. Kenny went to her apartment immediately. After knocking and receiving no response, they let themselves into the locked apartment with a key.

The first thing they noticed was "the smell of decomposition." Next they noticed wind billowing the curtain through an unlocked sliding glass door leading to the balcony. They found their daughter lying on the floor of her bedroom between the bed and the dressing table. A blanket covered her face. Although Kenny was a very neat housekeeper, dresser drawers were open, clothes spilled out, and shoes were scattered across the floor.

Christine Keers, a police homicide detective, described the crime scene. A knife found under Ms. Kenny's elbow was similar to knives in her kitchen. The cord to an electric iron had been cut off and placed on the nightstand next to the

---

[12]    Mr. Masewicz did not hear anyone go down the stairs. The following Monday, when the police came to investigate the murder, he did notice a fresh scrape mark, "like somebody had stepped there," on the wooden railing running along the side of his patio and below Ms. Kenny's balcony.

bed.  Sheets stripped from the bed were in a hamper.  A leaflet for the New Wine Fellowship Church in nearby Moreno Valley was found by the front door.

Cause of death was "multiple sharp-force injuries."  Kenny had been stabbed five times in the neck, once in the chest, and once in the abdomen.  Any one of four stab wounds would have been fatal.  The knife found under Kenny's elbow could have inflicted them.  There were also 16 cuts[13] on her hands, likely inflicted as she tried to defend herself.  There was a semen stain on the crotch of Kenny's pants.

Defendant's responsibility for the murder was established by, among other things, incriminating statements he made to coworkers before his arrest, incriminating statements he made to investigators, and physical evidence.

Defendant worked at Canyon Springs Cinema in Moreno Valley, along with his girlfriend Stephanie Compton, Terry De la Torre, Ricardo Decker, Kenya Starr, Matthew Shreiner, Yolanda Narez, and Matthew Texera.

According to Decker, Compton related a conversation she had with defendant as they drove past Kenny's apartment complex.  Defendant said he dreamt he saw the librarian being murdered.  As Compton told this to Decker, defendant was present and Compton asked him for confirmation.  "Dave, didn't you have a dream about that librarian being murdered over in the apartments by Canyon Crest?"  Defendant nodded in the affirmative.  At trial, Compton denied that she told Decker about the dream.  She did testify that defendant told her of a recurrent dream in which he looked through a window and saw someone being

---

[13]     According to Dr. Robert DiTraglia, a "stab" wound is deeper than it is long, and a "cut" wound is the converse.

stabbed. Defendant later admitted to Detective Keers that he dreamt of seeing a man stabbing a woman lying on a bed.

Kenya Starr testified that while he and defendant were cleaning the theater, defendant said: "I shouldn't have done it, she was nice, I shouldn't have killed her." Starr asked defendant what he was talking about. Defendant repeated that she was nice and he shouldn't have killed her. Starr said he did not believe defendant had killed anyone. Defendant responded that he could prove it, and a couple of days later he showed Starr a newspaper clipping of the Kenny murder.

Matthew Texera testified that defendant had assaulted him with a knife about a month before defendant was arrested for Kenny's murder. While Texera stood at the theater snack bar, defendant approached him from behind. Texera turned to see defendant punching him. When Texera tried to parry a blow, defendant slashed Texera's hand with a knife he carried in his other hand. On another occasion, defendant told Mr. Decker that he "had had to stab several people" in the past.

Defendant lived in a house in Moreno Valley with four other young men. In the bedroom defendant shared with one of them, officers found three newspaper clippings concerning the Kenny murder.[14]

The leaflet for the New Wine Fellowship Church Detective Keers found by Ms. Kenny's front door also linked defendant to her murder. Defendant was a member of the church and, like other congregants, passed out New Wine leaflets to prospective members. A month or two before the Kenny murder, defendant rang the doorbell of Darryl Luntao, who lived in a downstairs apartment directly

---

[14] Evidence implicating defendant in the other crimes was also found in his room. It will be described when those crimes are discussed below.

5

across from Ms. Kenny.  Defendant handed Luntao a New Wine leaflet and spoke to him for several minutes.

Finally, defendant was linked to the murder by serological testing of the semen stain found on the pants Kenny was wearing at the time of her death. Defendant, like 8 percent of the general population, shared the genetic profile revealed by that stain.

### 2. *The Burglary and Assault on Colleen Cliff*

On October 1, 1992, Colleen Cliff was sleeping in a guest room at the home of friends in Riverside.  Ms. Cliff awoke with a man straddling her and holding a knife to her throat.  When she screamed, he told her to shut up or he would kill her.  He asked who else was in the house.  When she named her host, the intruder apologized and said he had made a terrible mistake.  He claimed he was a "hit man" and was in the wrong house.  He led Ms. Cliff to the kitchen, where he returned the knife to a drawer.  Threatening to come back and kill her if she called police, he ran out the door.

Ms. Cliff testified that her assailant was six feet tall and slender.  Defendant was five feet 11 inches tall and weighed 150 pounds.

Although Ms. Cliff's assailant was wearing a ski mask, she could see the skin around his mouth, which she described as that of a Black man with a light skin tone.  She testified that defendant's skin tone was "[e]xactly as I remember."

Ms. Cliff's assailant was dressed in "all black," including a turtleneck sweater.  According to defendant's coworkers at the movie theater, he sometimes dressed entirely in black.  Yolanda Narez testified that once after work defendant changed into a black outfit he had in his backpack.  On another occasion Matthew Shreiner saw defendant dressed "in his ninja garb," "all black" with a "ninja mask" revealing only his eyes.  Stephanie Compton's car was parked in front of

6

defendant's house. In the trunk the police found a laundry bag containing a black turtleneck and a navy blue knit cap with eye and mouth holes cut into it.

### 3. *The Burglary and Rapes of Regina M.*

On November 3, 1992, Regina M. was asleep in her apartment in the Canyon Crest area of Riverside. Awakened by a noise, she saw a man at the foot of her bed. Calling himself a "ninja," the man was dressed entirely in black, with gloves, "sock type" nylon booties, and a mask or hood that revealed only his eyes. He was pointing a silver pistol at her.

The intruder asked Regina whether she was married. Hoping to scare him away, she falsely answered she was. He then claimed to be a "hit man" hired to murder her husband. Later, thinking he heard someone coming into the apartment, he stood inside the bedroom door, holding a dart he had taken from his sleeve.

The intruder had Regina change from her sleepwear to a business suit, then strip, put the suit back on, and then strip again before raping her. Then he had her change positions and raped her again. Afterwards, pointing to a spot on the sheet he said was his semen, he had her strip the bed and rinse the bottom sheet in the bathtub. He also had her wipe herself off with a towel and then wash the towel. However, a semen stain found on her pajama bottoms was available for serological testing. The testing revealed that defendant was in the 8 percent of the population who could have left that stain, just as he was in the same set of those who could have left the semen stain on Brenda Kenny's pants.

The intruder looked through Regina's mail and took a letter from JCPenney. Police found the letter in defendant's bedroom. In a desk in defendant's garage, the police found a pistol similar in shape, size, and color to the one used by the rapist. Stephanie Compton testified that the pistol belonged to defendant and that she had seen it in the desk. In the garage, the police also found

7

darts, a dart holder, and a Velcro strap for carrying the dart holder on the wrist or ankle.

Defendant's coworkers Ricardo Decker and Matthew Shreiner testified they had seen him at the theater wearing a black "ninja" outfit. According to Shreiner, defendant's outfit included a mask or hood that revealed only his eyes and thin cloth shoes with separations for his big toes. The police found a pair of such split-toed booties in defendant's garage, and Shreiner identified them as the ones he had seen defendant wearing.

In his statement to the police, defendant said that he "trained" in his ninja outfit, including a hood and, occasionally, split-toed booties, at night around the Canyon Crest area and Moreno Valley. He also said he had a .45-caliber pistol in a drawer in his garage.

Regina described the rapist as five feet 10 or 11 inches tall and weighing 140 to 150 pounds. As previously mentioned, defendant was five feet 11 inches tall and weighed 150 pounds. The rapist's skin tone, visible through the mask's eyeholes, was "light black," similar to defendant's. Asked specifically about defendant's eyes, Regina said, "Those are the eyes that I saw."

### 4. *The Burglary and False Imprisonment of Regenia Griffin*

The night of November 16, 1992, Regenia Griffin was asleep in the bedroom of her second-story apartment in the Canyon Crest area. Awakened by her dog's barking, she saw a man holding a gun. "He had on all black: black pants, black top, a hood that was black, with the eyes and mouth visible." He had come through an open sliding glass door leading to a balcony. The screen was locked, but had been cut.

When Ms. Griffin screamed, the burglar told her to be quiet and demanded money. Not having any cash, Griffin offered him credit cards or a check.

8

Complaining that he "didn't want that," the burglar pushed Griffin into a bathroom, locked her inside, and left.

Ms. Griffin testified that the burglar's skin color was very similar to defendant's, and that the burglar's "[g]rayish silver" pistol was very similar to the one found in the desk in defendant's garage. She said the burglar had a very slim build. Five feet one inch tall herself, she estimated his height as five feet 7 inches to five feet 9 inches.

### 5. *The Burglary and Rapes of Julia K., and Robbery of Joseph C.*

On the evening of December 10, 1992, while Julia K. was alone in her Moreno Valley home, a man suddenly appeared on her staircase. He had apparently gained entry through an upstairs bedroom window that had been left ajar. He was dressed in "[a]ll black, from head to toe;" only his eyes were visible through his black hood. Julia ran for the door, but he caught her, forced her upstairs at gunpoint, and raped her. Afterwards, he gave her a towel and told her to clean herself, which she did.

Later, concerned that he might react violently if surprised, Julia advised the rapist that her fiancé Joseph C. was due home from work. He said he might have to kill Joseph. Later, as Joseph started to enter the house, Julia, dressed only in a sweater, warned him not to move. She said: "We're being robbed, and there's a man in the house. He's dressed like a ninja, and he has a gun and a knife." The rapist put a three-foot sword to Joseph's throat, "hog-tied" him, and put him in an upstairs closet. Telling Julia to put on a teddy, he raped her twice, first with her astride him, and then by entering her from behind.

During Julia and Joseph's five-hour-long ordeal the rapist was oddly chatty. He said that he usually operated in Riverside, but that he liked Moreno Valley and would be back. He gave them advice on home security, saying that they should

9

get a meaner dog and should mount their motion detector lights higher so that a burglar could not unscrew them. Similarly, the rapist of Regina M. had lectured her on home security, saying he had entered through an unlocked window.

The rapist took Joseph's paramedic identification, which the police later found in a briefcase on defendant's bed, along with defendant's driver's license and college transcripts. A wallet found in defendant's living room contained a photograph of Julia and Joseph, as well as defendant's Social Security card, his library card, and a photograph of defendant and Stephanie Compton. The rapist had asked Julia and Joseph whether they "thought this was going to make it into the newspaper." A newspaper clipping regarding a burglary and rape in Moreno Valley was also found in the briefcase on defendant's bed.

The rapist's pistol was a silver automatic, similar in shape, size, and appearance to the pistol found in defendant's garage. The rapist's sword was similar to two swords found in defendant's garage. Defendant's girlfriend Stephanie Compton had given him one of the swords and had seen the other in his house. Defendant told police he "trained" with a "ninja sword." The rapist was wearing black gloves with gray duct tape on the fingers, like gloves found in defendant's bedroom. He was also wearing "ninja slippers" with a separation for the big toe, like the ones found in defendant's garage.

The semen stain on the towel the rapist gave Julia matched the genetic profile that defendant shares with 8 percent of the population, just as in the murder of Brenda Kenny and the rapes of Regina M. The rapist's skin color, visible through the eyeholes of his hood, was described by Julia as "light black" and by Joseph as "light brown." According to Joseph, it was "identical" to defendant's. According to Julia, the rapist was 6 feet tall.

10

*6. Prowling*

On the evening of December 17, 1992, Scott Clifford was smoking on the balcony of his parent's second-story condo in the Canyon Crest area. He saw a hooded man with a "lace-handled" sword strapped to his back emerge from a dark alley into a well-lit parking area. The prowler spotted Clifford and ran away. As the prowler was running, Clifford, a former martial arts student, could see the soles of the prowler's shoes and recognized them as "tabby-type" slippers with split toes. He testified that one of the swords seized in defendant's garage had the same "pattern of lacing" as the prowler's sword.

*7. The Attempted Murders of Phillip Courtney and Howard Long*

On January 18, 1993, in the early evening, Beverly Losee heard someone knocking on the door of her apartment on Canyon Crest Drive. Lacking a peephole, Losee asked who it was. The person responded, "It's Eddie." Not knowing an "Eddie," Losee peeked through the curtains. She saw a man dressed "all in black." After continuing to demand admittance for 20 minutes, the man walked away in the direction of the Hidden Springs apartment complex.

About an hour later, as Alison Schulz and Phillip Courtney started to enter their Hidden Springs apartment, Ms. Schulz was grabbed from behind by a man holding a gun. He was dressed in black martial arts clothing and wore a black ski mask. Courtney rushed the man. As they struggled for possession of the gun, the man stabbed Courtney in the back. A neighbor, Howard Long, heard the commotion, got his own pistol and ordered the assailant to "freeze." The man shot at Long and then ran away. Both of his lungs punctured, Courtney was hospitalized for two weeks.

At trial, Ms. Losee identified defendant as the man who knocked on her door that night. A criminalist testified that a bullet removed from Mr. Long's

doorframe was fired by the pistol found in defendant's garage. According to Courtney, his assailant was a light-skinned black man, similar in coloration, height, and weight to defendant.[15]

Defendant rested without presenting any evidence.

## B. Penalty Phase

### 1. Prosecution Evidence

Victim impact evidence was given by Brenda Kenny's father, mother, brother, sister, and brother-in-law. Kenny's family moved almost every year during her youth. As a consequence, the children relied on one another for companionship and grew very close. Later, Kenny and her siblings attended the same college so they could continue to be together. When her sister and brother had children, Kenny was so close to them it was as if "[t]hey were her children." Kenny also remained exceptionally close to her parents, calling her mother almost every night or stopping to visit. The day she was murdered Kenny's journal entry read: "I'm very in tune with Dad. And Mom is my friend."

Having heard the accounts of defendant's other victims, Ms. Kenny's father could not stop thinking about what she went through before she died. For Kenny's mother, it "was like my own life had ended as well." "[F]inding Gail lying on her bedroom floor, seeing the stab wounds and her face in death, will be an image that will haunt me the rest of my life." The most difficult thing for Kenny's sister was the murder's effect on her parents, who became severely depressed and required psychiatric care. "The first three years I thought I lost my parents," she testified. Kenny's brother feared his mother might not "survive." Upon returning to her

---

[15] Pursuant to section 1118.1, the court entered a judgment of acquittal on a count charging defendant with assaulting Alison Schulz with a deadly weapon.

12

own home in Texas, after taking care of her parents for two months, Kenny's sister "absolutely could not stay in the house by myself after dark." When her husband traveled for business she had to stay with friends. Her husband was also fearful. For a month after the murder, while his wife was with her parents, he slept with the lights on. Years later, Kenny's brother was still fearful about leaving his children alone at home.

### 2. *Defense Evidence*

The defense called seven witnesses: three psychologists who examined defendant when he was a child, two of his teachers, his sister, and an employer. The portrait of defendant that emerged from their testimony was of a deeply disturbed child of average intelligence who grew up in the loveless and abusive homes of his mother and aunt. However, by his junior year in high school, defendant had become a well-liked, well-behaved student who excelled in his classwork.

Defendant's mother was convicted of prostitution seven times and allegedly plied her trade in the presence of defendant and his younger sister, Denise. Defendant's mother and her boyfriend physically abused the children. When defendant was seven and Denise four they were removed from their mother's custody and placed with their aunt. However, according to Denise, the aunt did not provide a fit home either and treated them without affection. Denise contracted a venereal disease from one of her cousins, and the aunt frequently had defendant hospitalized for imagined faults. Denise did not believe defendant was guilty of these offenses and hoped he would avoid the death penalty.

In kindergarten, defendant was referred to school psychologist Eleanor Kniffen and was diagnosed with attention deficit hyperactivity disorder. He was hostile to his classmates and would throw stones at them as they walked home

13

from school. He scored below average in vocabulary and reading. However, he was of average intelligence, and in Kniffen's opinion, capable of doing college level work one day.

Defendant was hospitalized for six weeks for psychological evaluation when he was seven or eight years old. Dr. Kenneth Fineman testified that, "for a kid that age, [defendant] had an awful lot of unusual sexual things going through his mind." This suggested to Fineman that defendant might have been abused or exposed to inappropriate sexual materials. When he was discharged from the hospital, defendant's diagnosis was organic brain syndrome and childhood schizophrenia. This meant that his cognitive and mood disorders might have been attributable to abnormalities in his brain, and not entirely to his environment.

When defendant was eight years old he was placed in a special education center because he was "severely emotionally disturbed." Yet he fell within the normal range on the Wechsler intelligence scale. Initially, defendant's teacher at the center was Jeanne Weyers. During defendant's four or five years there, Ms. Weyers saw "tremendous improvement" in him. One of the fondest memories of her 25-year teaching career was seeing defendant, toward the end of his stay, playing happily with another child. Ms. Weyers believed that death was not the appropriate punishment for defendant because he "didn't have a chance as a child."

Frances Lenore was his special education teacher for English and math when defendant was a junior in high school. Her students were of normal intelligence, but had language problems. Defendant was her "very best student" and received "very good grades." Ms. Lenore was aware that defendant was once diagnosed as schizophrenic, but she saw no sign of "anything out of the ordinary." Defendant "[a]lways did his assignments and never disturbed anybody. He just

14

did what he was supposed to do." He seemed well liked by the other students. Ms. Lenore "would really feel it if he had to die."

For three years, up until the time of these offenses, defendant worked for Grace Scott[16] on weekends as a gardener. He was polite, affectionate, and an excellent worker. Ms. Scott came to love defendant and believed his life should be spared.

## II. DISCUSSION

### A. Pretrial Issues

#### 1. Denial of Severance

Defendant moved to sever the Kenny murder count from the other charges. He argued the evidence was not cross-admissible, and that his ability to defend the murder count would be seriously prejudiced by the inflammatory nature of the other charges. Denying the motion, the trial court ruled that the evidence was cross-admissible as to intent, plan, and identity, and that defendant would not be unduly prejudiced by joinder. On appeal, defendant renews his claims on cross-admissibility and prejudice. Defendant's claims fail.

Section 954 provides in relevant part: "An accusatory pleading may charge two or more different offenses *connected together in their commission*, or different statements of the same offense or two or more different offenses *of the same class of crimes or offenses,* under separate counts, and if two or more accusatory pleadings are filed in such cases in the same court, the court may order them to be consolidated." (*Ibid,* italics added.) The statute also provides that "the court in which a case is triable, in the interests of justice and for good cause shown, may *in its discretion* order that the different offenses or counts set forth in the accusatory

---

[16] No relation to defendant.

15

pleading be tried separately or divided into two or more groups and each of said groups tried separately." (*Ibid*., italics added.)[17]

Because it ordinarily promotes efficiency, joinder is the preferred course of action. When the statutory requirements are met, joinder is error only if prejudice is clearly shown. (*People v. Hartsch* (2010) 49 Cal.4th 472, 493 (*Hartsch*); *People v. Soper* (2009) 45 Cal.4th 759, 771-774 (*Soper*); *Alcala v. Superior Court* (2008) 43 Cal.4th 1205, 1220 (*Alcala*).)

" 'In determining whether a trial court abused its discretion under section 954 in declining to sever properly joined charges, "we consider the record before the trial court when it made its ruling." ' (*People v. Soper*[, *supra*,] 45 Cal.4th 759, 774, quoting *Alcala v. Superior Court*[, *supra*,] 43 Cal.4th 1205, 1220 . . .) 'The relevant factors are whether (1) the evidence would be cross-admissible in separate trials, (2) some charges are unusually likely to inflame the jury against the defendant, (3) a weak case has been joined with a strong case, or with another weak case, so that the total evidence may unfairly alter the outcome on some or all charges, and (4) one of the charges is a capital offense, or joinder of the charges

---

[17]    The statute further provides: "The prosecution is not required to elect between the different offenses or counts set forth in the accusatory pleading, but the defendant may be convicted of any number of the offenses charged, and each offense of which the defendant is convicted must be stated in the verdict or the finding of the court. . . . An acquittal of one or more counts shall not be deemed an acquittal of any other count." (§ 954.)

With the adoption of Proposition 115 by initiative in 1990, section 954.1 was added, providing: "In cases in which two or more different offenses of the same class of crimes or offenses have been charged together in the same accusatory pleading, or where two or more accusatory pleadings charging offenses of the same class of crimes or offenses have been consolidated, *evidence concerning one offense or offenses need not be admissible as to the other offense or offenses before the jointly charged offenses may be tried together before the same trier of fact*." (Italics added.)

16

converts the matter into a capital case." ([*People v.*] *Zambrano* [(2007)] 41 Cal.4th [1082,] 1128–1129.) '[I]f evidence underlying the offenses in question would be "cross-admissible" in separate trials of other charges, that circumstance normally is sufficient, standing alone, to dispel any prejudice and justify a trial court's refusal to sever the charged offenses.' (*Alcala*, *supra*, at p. 1221; see *Zambrano*, *supra*, at p. 1129.) '[A] jury may consider properly admissible "other crimes" evidence so long as it finds "by a preponderance of the evidence" that the defendant committed those other crimes.' (*Alcala*, *supra*, at p. 1224, fn. 14; see *Soper*, *supra*, at p. 778.)" (*People v. Lynch* (2010) 50 Cal.4th 693, 735-736 (*Lynch*).)

When evidence is offered under Evidence Code section 1101, subdivision (b), the degree of similarity required for cross-admissibility ranges along a continuum, depending on the purpose for which the evidence is received. The least degree of similarity is required to prove intent. A higher degree is required to prove common plan, and the highest degree to prove identity. (*Lynch*, *supra*, 50 Cal.4th at p. 736; *Soper*, *supra*, 45 Cal.4th at p. 776; *People v. Ewoldt* (1994) 7 Cal.4th 380, 402-403 (*Ewoldt*).)

The trial court found that evidence of the Julia K. and Regina M. burglaries and rapes would be cross-admissible in the Kenny murder trial on the intent element of the burglary and rape special-circumstances allegations. Defendant contends this was error, arguing that "intent was never a contested issue in the murder count." Defendant is wrong. By pleading not guilty, he put all the elements of the murder, as well as the burglary and rape special-circumstances allegations, in dispute. (*People v. Lindberg* (2008) 45 Cal.4th 1, 23; *People v. Whisenhunt* (2008) 44 Cal.4th 174, 204; *People v. Roldan* (2005) 35 Cal.4th 646, 705-706.)

17

Defendant's reliance on *People v. Thompson* (1980) 27 Cal.3d 303 (*Thompson*) is misplaced. In *People v. Rowland* (1992) 4 Cal.4th 238, we disapproved the *Thompson* passage on which he relies. "Defendant also argues that the challenged 'other crimes' evidence cannot be deemed 'relevant' under Evidence Code section 210 to the broad issue of his intent in the incident as a whole. For support, he asserts that such intent was not a 'disputed fact' within the meaning of the statutory provision. It was. He relies essentially on language in *People v. Thompson*[, *supra*,] 27 Cal.3d 303, 315, that 'The fact that an accused has pleaded not guilty is not sufficient to place the elements of the crimes charged against him "in issue." ' But in *People v. Williams* [(1988)] 44 Cal.3d [883,] 907, footnote 7, we all but expressly disapproved *Thompson*'s language and held to the contrary. Therefore, a fact—like defendant's intent—generally becomes 'disputed' when it is raised by a plea of not guilty or a denial of an allegation. (Pen. Code, § 1019 ['The plea of not guilty puts in issue every material allegation of the accusatory pleading, except those allegations regarding previous convictions of the defendant to which an answer is required by [Penal Code] Section 1025.'].) Such a fact remains 'disputed' until it is resolved." (*Rowland,* at p. 260.)

A defendant may seek to limit the admissibility of other crimes evidence by stipulating to certain issues. However, defendant did not do so here. To the contrary, he vigorously contested the intent to rape. Moreover, "[t]he general rule is that the prosecution in a criminal case cannot be compelled to accept a stipulation if the effect would be to deprive the state's case of its persuasiveness and forcefulness. [Citations.]" (*People v. Edelbacher* (1989) 47 Cal. 3d 983, 1007; accord: *People v. Scheid* (1997) 16 Cal.4th 1, 17; *People v. Arias* (1996) 13 Cal.4th 92, 131.)

Defendant further contends the facts of the Julia K. and Regina M. burglaries and rapes were not sufficiently similar to support the inference that he

18

intended to burglarize and rape Brenda Kenny.  To be admissible to prove intent, the charges must be sufficiently similar to support the inference that the defendant probably harbored the same intent in each instance.  (*Lynch*, *supra*, 50 Cal.4th at p. 736; *Soper*, *supra*, 45 Cal.4th at p. 776; *Ewoldt*, *supra*, 7 Cal.4th at p. 402.) "The recurrence of a similar result . . . tends (increasingly with each instance) to negative accident or inadvertence or self-defense or good faith or other innocent mental state, and tends to establish (provisionally, at least, though not certainly) the presence of the normal, i.e., criminal, intent accompanying such an act . . . . " (2 Wigmore, Evidence (Chadbourne rev. ed. 1979) § 302, p. 241, quoted with approval in *Alcala*, *supra*, 43 Cal.4th at pp. 1223-1224; *People v. Rogers* (2006) 39 Cal.4th 826, 853; *Ewoldt*, *supra*, 7 Cal.4th at p. 402.)

Not only were the Julia K. and Regina M. burglaries and rapes sufficiently similar to the Kenny offenses to be cross-admissible on intent, the other serious charges against defendant were also cross-admissible to prove plan and scheme as well.  All of these crimes were similar in four significant respects:  (1) they occurred at night; (2) within approximately a four-month period; (3) in the Canyon Crest area of the City of Riverside or nearby Moreno Valley;[18] and (4) the culprit threatened or used deadly force.[19]  The other charges were also similar to the

---

[18]    The locations of the crimes were marked on People's exhibit No. 96, a map of portions of Riverside and Moreno Valley.  In closing argument, the prosecutor referred to this exhibit in noting that (1) all but one of the offenses charged against defendant occurred in the Canyon Crest area of Riverside, and (2) defendant told the police that he trained as a ninja in this area at night.  The exception to this pattern were the crimes committed against Julia K. and Joseph C. in Moreno Valley.  As noted, Julia K.'s rapist told her and Joseph C. that he had never before committed any burglaries in the Moreno Valley area.

[19]    A mistrial was declared as to two other sets of charges: burglary, false imprisonment, and kidnapping of Linda Gonzales, and assault with a deadly weapon on Edward Buhr.  On the night of November 14, 1992, a masked man

*(footnote continued on next page)*

19

Kenny murder in other respects. For example, serological testing demonstrated that the Kenny, Regina M., and Julia K. rapists had the same genetic profile that defendant shares with only 8 percent of the population. Defendant took care to minimize recoverable evidence. He told Julia K. to wipe herself off with a towel. He also told Regina M. to wipe herself, wash the towel, strip the bed, and wash the sheets. The sheets were removed from Kenny's bed. Kenny was apparently murdered with one of her own kitchen knives; Colleen Cliff's assailant returned the knife to her kitchen drawer. Finally, objects seized in defendant's residence appeared to be souvenirs of his crimes against Kenny, Regina M., and Julia K.: newspaper clippings of the Kenny murder; a letter to Regina M.; a photo of Julia K. and Joseph C.; and Joseph C.'s paramedic identification.

Taken together this substantial body of evidence would have been properly admitted, even if the Kenny murder had been tried separately. It supports a reasonable conclusion that defendant acted out a predetermined plan or scheme. (*People v. Kelly* (2007) 42 Cal.4th 763, 782-785; *People v. Catlin* (2001) 26 Cal.4th 81, 110-112; *Ewoldt*, *supra*, 7 Cal.4th at pp. 402-403.) He planned to commit burglaries, robberies, and sexual assaults at night, in a predetermined area. He implemented his plan by breaking into homes and using deadly force or threats to dominate his victims. He tried to destroy DNA evidence that might link him to

---

*(footnote continued from previous page)*

dressed in black entered a window of Ms. Gonzales's apartment in the Canyon Crest area of Riverside. He threatened to kill her, forced her to move around the apartment, and then fled when she began screaming. On the night of November 16, 1992, a hooded man dressed in black began to enter the window of Mr. Buhr's apartment in the Canyon Crest area of Riverside. The man pointed a gun at Buhr through the window and threatened to blow his head off, but fled when Buhr slammed the window on his arm.

the crimes, and he kept "trophies" of his exploits. It also supports a reasonable conclusion that during one of his rape attacks he murdered Brenda Kenny.

For identity to be established, the offenses must share common features that are so distinctive as to support an inference that the same person committed them. (*People v. Foster* (2010) 50 Cal.4th 1301, 1328; *Lynch*, *supra*, 50 Cal. 4th at p. 736; *Ewoldt*, *supra*, 7 Cal.4th at p. 403.) The inference of identity need not depend on one or more unique or nearly unique common features; features of substantial but lesser distinctiveness may yield a distinctive combination when considered together. (*Lynch*, at p. 736; *People v. Miller* (1990) 50 Cal.3d 954, 987; *People v. Haston* (1968) 69 Cal.2d 233, 245-246.)

In *Lynch*, *supra*, 50 Cal.4th 693, we cited cases in which we had found sufficient similarity to support an inference of identity. Two of those cases were *Soper*, *supra*, 45 Cal.4th 559 and *Alcala*, *supra*, 43 Cal.4th 1220. "In *Soper*, two homicides occurred within four months of each other at campsites that were easy walking distance from each other, forensic evidence tied the defendant to each crime scene, and witnesses linked the defendant to each victim close to the time of death. (*Soper*, *supra*, 45 Cal.4th at p. 778, fn. 14.) We agreed with the People that this evidence appeared to be cross-admissible on the issue of identity. (*Id*. at p. 779.) Likewise, in *Alcala*, we concluded that evidence that each of the five homicide victims was a young, single, Caucasian female who was discovered unclothed or nude from the waist down, all of the homicides involved blunt-force facial trauma and appeared to involve a sexually sadistic motive, and the offenses occurred within a 19-month period, supported a conclusion by a preponderance of the evidence that the defendant was the perpetrator in each homicide. (*Alcala*, *supra*, 43 Cal.4th at p. 1224.)" (*Lynch*, at pp. 736-737.)

The large set of strikingly similar circumstances here also arguably supports the inference that all of the crimes here were committed by the same

21

person. However, even if we assume for the sake of argument that the evidence was not cross-admissible on identity, severance was nevertheless not required. While often sufficient in itself, cross-admissibility is not required. The factors that weigh in favor of severance when evidence is *not* cross-admissible are absent here. (See *Soper*, *supra*, 45 Cal.4th at p. 775.) The evidence supporting defendant's guilt of the other crimes was exceptionally strong. However, so was the evidence in the Kenny case. If the evidence of the other charges was distressing, it certainly was no more so than the evidence in the Kenny murder. Finally, joinder of the other charges did not convert the Kenny murder into a capital case. A fortiori, defendant has not shown actual prejudice amounting to a denial of fundamental fairness and due process. (See, e.g., *Hartsch*, *supra*, 49 Cal.4th at pp. 494-495.)

Defendant further claims that even if joinder was correct at the time, in hindsight he was deprived of a fair trial and due process. (See *Soper*, *supra*, 45 Cal.4th at p. 783; *People v. Zambrano, supra,* 41 Cal.4th 1082, 1130.) The claim fails. Defendant does not explain how hindsight casts a new light on the question of prejudice here.

### *2. Admissibility of Defendant's Statements to the Police*

Following his arrest, defendant was taken to the police station and questioned for 16 minutes before he was advised of his *Miranda* rights.[20] After waiving them he made the following incriminating statements: he dreamt of seeing a woman in bed being stabbed by a man (*ante*, pt. I.A.1.); he trained at night in a ninja outfit in the Canyon Crest area and Moreno Valley (*ante*, pt. I.A.3.); and he possessed a .45-caliber pistol (*ibid.*). Defendant contends these statements should have been excluded on four grounds, none of which prevail.

---

[20] *Miranda v. Arizona* (1966) 384 U.S. 436.

22

*a. Probable cause for defendant's arrest*

Defendant first contends his statements should have been excluded as the poisonous fruit of an arrest made without probable cause. The argument fails because defendant's arrest was proper.

"Probable cause exists when the facts known to the arresting officer would persuade someone of 'reasonable caution' that the person to be arrested has committed a crime. (*Dunaway v. New York* (1979) 442 U.S. 200, 208, fn. 9.) '[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts . . . . ' (*Illinois v. Gates* (1983) 462 U.S. 213, 232.) It is incapable of precise definition. (*Maryland v. Pringle* (2003) 540 U.S. 366, 371.) ' "The substance of all the definitions of probable cause is a reasonable ground for belief of guilt," ' and that belief must be 'particularized with respect to the person to be . . . seized.' (*Ibid.*)" (*People v. Celis* (2004) 33 Cal.4th 667, 673.)

Probable cause here was provided by statements of defendant's coworkers Ricardo Decker and Terry De laTorre.

On January 21, 1993, the Riverside Police Department received the following phone message from an anonymous informant. The "ninja guy who's breaking into the apartments in Canyon Crest" was David Scott. Scott worked at a movie theater on Day Street. He was "half black . . . half Japanese," "six foot six one," and "fairly skinny but . . . extremely strong." The informant had seen Scott dressed in a "ninja outfit" with a "long skinny sword" and a "big knife." Scott had frequently spoken of "stabbing people" and being chased by the police. With regard to the murder of the "librarian lady," Scott "told me that he had dreamt about it or . . . had an out of body experience where he actually had done the crime and I just thought he was just full of it at the time, but . . . when I read the article yesterday it fit the description."

23

That same day Detective Keers interviewed De laTorre, an assistant manager at the Canyon Springs Cinemas in Moreno Valley. De laTorre confirmed they had an employee named David Scott. She said that other employees had discussed the possibility that defendant was the "Ninja Rapist." He had been seen wearing a ninja outfit, carrying ninja stars and, after work, jumping from one roof to another. Asked by another employee the day before about his stars, defendant said he had lost them.[21] Christy Wells, another employee, had told De laTorre that defendant said he had been chased by police through the Canyon Crest area.

Detective Keers then interviewed Ricardo Decker, the only other employee present at the time. Recognizing his voice from the recorded tip, Keers asked Decker if he was the anonymous informant. Decker confirmed he was. Decker was 21 years old, seemed to be of average intelligence, and responded to Keers's questions readily. Decker gave Keers the following information. Defendant "liked to dress up as a ninja" and told Decker he practiced ninja skills in the hills of the Canyon Crest area of Riverside. One evening, around January 17, 1993, defendant left the theater in a ninja outfit, including a hood, knife, and sword.[22] Defendant told Decker he had stabbed people. Defendant owned a .45-caliber handgun. Stephanie Compton told Decker that defendant had placed the gun to her head when he was angry with her. Compton also told Decker of an incident that occurred two days before the news of Brenda Kenny's murder appeared in the papers. As Compton and defendant drove past Ms. Kenny's apartment building, he pointed at it and said: "A woman was murdered over there." The day after an

---

[21] Detective Keers knew that "throwing stars" had been found at the scene of the Courtney attack, which occurred three days before the interview.

[22] The attempted murders of Phillip Courtney and Howard Long occurred on January 18. (*Ante*, pt. I.A.6.)

article on Kenny's murder was published, Compton told Decker that defendant "dreamt he saw the woman being stabbed by a man."

Faced with this overwhelming showing of probable cause, defendant raises two objections. First, he claims that Decker could not be considered a reliable "citizen informant" because his initial tip had been made anonymously. The claims fails. "We have distinguished between those informants who 'are often criminally disposed or implicated, and supply their "tips" . . . in secret, and for pecuniary or other personal gain' and victims or chance witnesses of crime who 'volunteer their information fortuitously, openly, and through motives of good citizenship.' (*People v. Ramey* (1976) 16 Cal.3d 263, 268-269.)" (*Humphrey v. Appellate Division* (2002) 29 Cal.4th 569, 576.) There was no reason to believe that Decker approached the police from any motive other than good citizenship. He readily acknowledged that he made the phone call. Thus, he no longer remained anonymous. He neither sought nor received any personal gain. He was an adult of apparently average intelligence. He responded to questions in a "very open manner." Moreover, the information he provided was corroborated in significant part by De laTorre. Accordingly, ample reason existed to consider him a reliable citizen informant.

Second, defendant contends that Decker should have been considered unreliable because he gave conflicting accounts of how he learned of defendant's dream about Kenny's murder. During the phone call, Decker reported that defendant told him that he had dreamt about the Kenny murder or had an out-of-body experience in which he committed it. In his interview with Detective Keers, Decker said that Stephanie Compton had told him of defendant's dream. Keers questioned Decker about this discrepancy. He explained that he had participated in numerous conversations with defendant and Compton, "and he wasn't sure exactly who told him what portions." Regardless of whether Decker learned of the

25

alleged dream directly from defendant or through Compton, it supported the conclusion that there was probable cause to arrest defendant.

### b. *Alleged taint of pre-advisement questioning*

Defendant was arrested and asked some questions before he was advised of his *Miranda* rights. Some of the inquiries involved standard booking information. However, he was also asked about his hobbies. Defendant said they included martial arts. The officers asked a series of followup questions, culminating in defendant's statement that he practiced various elements of the martial arts with a teacher at night in a park, including "the art of invisibility, the art of escape, and the art of tools, the art of climbing, the art of . . . how to kill somebody and stuff like that."

At the suppression hearing, the court excluded all of the incriminating, non-booking statements that defendant made before he was advised of his *Miranda* rights.[23] Defendant contends that the incriminating statements he made *after* waiving his *Miranda* rights should also have been suppressed because they were tainted by the earlier *Miranda* violation. This contention fails.

"Even when a first statement is taken in the absence of proper advisements and is *incriminating*, so long as the first statement was voluntary a subsequent voluntary confession ordinarily is not tainted simply because it was procured after a *Miranda* violation. Absent 'any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will,' a *Miranda* violation — even one resulting in the defendant's letting 'the cat out of the bag' — does not 'so taint[] the investigatory process that a subsequent voluntary and

---

[23] In addition to the martial arts statements, the trial court excluded defendant's responses to questions concerning his family history, military experience, prior police contacts, work schedule, and schooling.

26

informed waiver is ineffective for some indeterminate period.' (*Oregon v. Elstad* (1985) 470 U.S. 298, 309, 311; see also *People v. Storm* (2002) 28 Cal.4th 1007, 1033.) Rather 'there is no warrant for presuming coercive effect where the suspect's initial inculpatory statement, though technically in violation of *Miranda*, was voluntary. The relevant inquiry is whether, in fact, the second statement was also voluntarily made.' (*Oregon v. Elstad, supra,* 470 U.S. at p. 318, fn. omitted; see also *People v. San Nicolas* (2004) 34 Cal.4th 614, 639 [' "A subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement" '].)" (*People v. Williams* (2010) 49 Cal.4th 405, 448 (*Williams*); accord, *People v. Haley* (2004) 34 Cal.4th 283, 303-304; *People v. Bradford* (1997) 14 Cal.4th 1005, 1033.)

Defendant does not contend that his pre-advisement statements were involuntary. Rather, relying on *People v. Honeycutt* (1977) 20 Cal.3d 150 (*Honeycutt*), he contends his subsequent statements should have been suppressed because the police "softened him up" with the earlier questions, "employ[ing] the tactic of ingratiating themselves with [him] by asking him seemingly innocuous questions about his school, his roommates, his hobbies . . . ."[24]

*Honeycutt*, *supra*, 20 Cal.3d 150, is distinguishable on its facts. Detective Williams, whom Honeycutt called "Mr. Johnnie," had known Honeycutt through police contacts for 10 years. By contrast, Honeycutt was hostile to the other interrogating officer, calling him racist epithets and spitting at him. After that

---

[24] In response to questioning, defendant said that he was a high school graduate, was attending community college, and planned to be a lawyer. Defendant also said that he had four roommates and that he was the "slob" of the group.

officer left the interrogation room, Williams "engaged defendant in a half-hour unrecorded discussion. Williams testified that they discussed unrelated past events and former acquaintances and, finally, the victim. Williams mentioned that the victim had been a suspect in a homicide case and was thought to have homosexual tendencies. Although he stated that he did not expect defendant to talk about the offense, Williams testified that 'It was my duty to continue the efforts to try to get him to talk. And I was successful in it.' In the course of their interview Williams 'could see that [defendant] was softening up.' Williams said that they stayed away from a discussion of the offense, but by the end of the half-hour defendant indicated that he would talk about the homicide." (*Honeycutt*, *supra*, 20 Cal.3d at p. 158.) After being advised of his *Miranda* rights, Honeycutt waived them and confessed to the killing. (*Honeycutt,* at p. 159.) This court ruled the confession inadmissible in any retrial because the waiver resulted from "a clever softening-up of a defendant through disparagement of the victim and ingratiating conversation . . . ." (*Id*. at p. 160.)

Here the pre-advisement interrogation was recorded. Reviewing it, we find neither of the two salient features of *Honeycutt*. The interrogating officers, who apparently had no prior relationship with defendant, did not seek to ingratiate themselves with him by discussing "unrelated past events and former acquaintances." (*Honeycutt*, *supra*, 20 Cal.3d at p. 158.) Nor did they disparage his victims. (*Ibid*.) Defendant's reliance on *Honeycutt*, therefore, is misplaced (*People v. Gurule* (2002) 28 Cal.4th 557, 602; *People v. Michaels* (2002) 28 Cal.4th 486, 511), as is his reliance on *Missouri v. Seibert* (2004) 542 U.S. 600. Unlike *Seibert*, there is no evidence here that the officers were "following a policy of disregarding the teaching of *Miranda*." (*Williams*, *supra*, 49 Cal.4th at p. 448.)

28

### c. Voluntariness

Defendant claims that his statement concerning his "dream" about seeing a woman stabbed was involuntary because the officers obtained it by promising he would be treated leniently. The claim fails.

Defendant relies primarily on two statements made by Detective Theuer. To put these statements in context, defendant's waiver appears at page 17 of the interrogation transcript. Theuer's first alleged promise of leniency appears at page 60. The intervening 47 pages largely concern defendant's claim that he trained at night with a mysterious ninja master in the hills surrounding the Canyon Crest area. After questioning him for 18 pages, Detective Theuer told defendant they were investigating something more serious than prowling. Ten pages later, Theuer asked defendant whether he had any firearms. Defendant responded that he had a .45. Asked about his footwear, defendant said he had ninja shoes, split-toed tabbies. Theuer then advised defendant they were investigating a case in which a man in ninja garb broke into a woman's apartment and raped her. He said they had a DNA sample. Detective Heredia said the man matched defendant's description and they had enough evidence to arrest him on a number of cases in the Canyon Crest area. Defendant repeatedly denied he was the rapist.

It was at this point that Theuer made the first challenged statement. "We, we want you to level with us okay. It's very important that you level with us. Now you know, and we know, how that [DNA] test is going to come out. Now it's going to be a whole lot better, you're gonna to feel a lot better about yourself, . . . you're gonna be more like a man if you fess up to what you did. It's very[,] very important that you be truthful with us right now. If you're truthful with us and you tell us exactly what happened, it'll make things go much better, cuz we both know what happened."

29

Defendant responded by continuing to protest his innocence. "I don't know what to say to you. All I can say is I didn't do it. . . . I tell you from my heart that I did not do it. I didn't rape her. . . . I didn't do anything."

Twenty pages later Theuer made the second challenged statement. "I won't deny that you're facing some serious charges here. I mean you really are. But, by your being honest with me and telling me what really happened here, and by saving us a whole lot of trouble down the line, we're going through the court processing, going through all the garbage, you're gonna save yourself because you're gonna, you know why, because you're gonna admit it, you're gonna be able to get on with your life, you're gonna be able to put this behind you, but if we sit here and we drag this on through the courts for years or how long it takes to go through there, it's going to take forever to finally come to the end of all this . . . and then you start your sentence. See what I'm saying. I'm just saying be truthful with me, tell me what really happened. . . . I can finally help you out here. But I can't help you if you won't help yourself. . . . [F]orget[] the prowling and all that . . . I just wanna know about the rape of that young lady and I wanna know about this last incident that happened Monday night. That's all I wanna know, if you'll just tell me what happened, the truth, we can get on with it, you can get on with your life."

Defendant immediately responded, "I'm telling you, my answer hasn't changed because I didn't do it."

Having reached an impasse, Detectives Theuer and Heredia took a break. Afterwards, Detective Keers joined the interrogation team. She took an entirely different tack. Rather than accusing defendant, Keers said she was "really impressed with what you do" and wanted to "find out more about your ninja work." In particular, she asked whether defendant, like some ninja masters, had out-of-body experiences. Defendant responded that he did not have out-of-body

experiences, but did have "dreams." Keers asked whether "something has come up in your dream that comes true?" Defendant said, "yes," and Keers asked him to elaborate. For the next 20 pages defendant described a dream in which he was flying, looked through a window, and saw a man stabbing a woman He drew a diagram of the room, described the woman's appearance, and confirmed that he had told his girlfriend about the dream. However, he claimed that it was just a dream, and for the remainder of the interrogation insisted that he was innocent of any crime.

A criminal conviction may not be founded upon an involuntary confession. (*Lego v. Twomey* (1972) 404 U.S. 477, 483.) The prosecution has the burden of establishing voluntariness by a preponderance of the evidence. Whether a confession was voluntary depends upon the totality of the circumstances. We accept a trial court's factual findings, provided they are supported by substantial evidence, but we independently review the ultimate legal question. (*Williams*, *supra*, 49 Cal.4th at p. 436; *People v. Carrington* (2009) 47 Cal.4th 145, 169 (*Carrington*).) Here, the trial court found, after listening to the tapes and reviewing the transcripts of the interrogation, that defendant spoke of his dream voluntarily.

We need not determine whether Detectives Theuer and Heredia promised defendant leniency. The alleged promises would not have rendered defendant's statement concerning his dream involuntary unless his statement was "causally related" to them. (*Williams*, *supra*, 49 Cal.4th at p. 437; accord: *People v. Guerra* (2006) 37 Cal.4th 1067, 1093 (*Guerra*); *People v. Maury* (2003) 30 Cal.4th 342, 404-405 (*Maury*).) It was not. Keers, not Theuer, elicited defendant's statements about a dream. Defendant did not mention the dream until Theuer and Heredia broke off the interrogation and Keers took the lead. It was only after she talked about defendant's ninja skills and asked whether he had psychic powers that he

spoke of the dream. "KEERS: You've had these, you've had these meditation experiences that you told people about. [¶] SCOTT: Naw. [¶] THEUER: Visions, you had visions before? [¶] KEERS: Visions, have you had dreams before, where something has come up in your dream that comes true? [¶] SCOTT: Ah, I've, yes I have. [¶] KEERS: Okay what about that? [¶] SCOTT: Um, I had a dream, I had a dream that I saw someone getting stabbed in a window and I saw . . . a woman, I saw a man, and I saw a lot of trees, this wasn't during meditat[ion], I was asleep." This exchange, of course, did not occur in a vacuum. Defendant had earlier told his girlfriend Stephanie Compton about a dream (*ante*, pt. I.A.1.) and had readily confirmed it when Compton mentioned it to their coworker Ricardo Decker (*ibid.*).

Defendant also contends the interrogation was coercive because the officers "falsely suggest[ed] that the DNA testing done on the victim would be physically painful." Defendant relies on two statements made by Detective Theuer. Defendant said he was willing to take a DNA test because he was confident it would exonerate him. Theuer responded, "[T]hat's not the point at issue." The point, he said, was whether defendant was going to act like a man and own up to what he did. In the alternative, "Do we have to put you through those test[s], . . . do we have to put her through that again, do we have to hurt her again? or are you going to face up to this?" Nineteen pages later, Theuer said, "Now, if you wanna drag this poor school teacher through all this muck of having to testify against you and going through all that, and not face up to your responsibility and not be honest, I guess we can do that, we can go the hard way."

The use of deceptive statements during an interrogation does not invalidate a confession as involuntary unless the deception is of a type reasonably likely to produce an untrue statement. (*Williams, supra,* 49 Cal.4th at p. 443; *Carrington*, *supra*, 47 Cal.4th at p. 172; *People v. Jones* (1998) 17 Cal.4th 279, 299.) That is

32

not the case here.  Theuer's statements were not reasonably likely to produce an untrue statement.  Moreover, they were not deceptive.  Theuer did not suggest that DNA testing would be physically painful for the victim.  The better reading of his statements is that testifying would be emotionally trying for her.  Finally, it is inconceivable that defendant, who had murdered one woman and raped two others, could be forced against his will to speak and lie about his conduct because one of his victims might experience some additional discomfort.

### d.  Asserted invocation of right to remain silent

Finally, defendant contends that he ultimately invoked his right to remain silent.

"As we stated in *People v. Stitely* (2005) 35 Cal.4th 514, 535, '[i]n order to invoke the Fifth Amendment privilege after it has been waived, and in order to halt police questioning after it has begun, the suspect "must *unambiguously*" assert his right to silence . . . .'  (See also *People v. Rundle* (2008) 43 Cal.4th 76, 114.)  In addition, we also concluded that the 'stop and clarify' rule does not apply to ambiguous assertions of the right to silence.  'Faced with an ambiguous or equivocal statement, law enforcement officers are not required . . . either to ask clarifying questions or to cease questioning altogether.'  (*People v. Stitely*, *supra*, 35 Cal.4th at p. 535; see also *People v. Rundle*, *supra*, 43 Cal.4th 76, 115.)" (*People v. Martinez* (2010) 47 Cal.4th 911, 947-948; accord: *Berghuis v. Thompkins* (2010) 560 U.S. __, [131 S.Ct. 33]; *People v. Bacon* (2010) 50 Cal.4th 1082, 1107-1108, fn. 5.)

An allegation of invocation under *Miranda* was not one of the several grounds upon which defendant challenged the admissibility of his statement below.  As a result, the trial court had no opportunity to resolve material factual disputes and make necessary factual findings.  Therefore, as the Attorney General

33

correctly observes, the claim has been forfeited. (*People v. Low* (2010) 49 Cal.4th 372, 392; *People v. Smith* (2007) 40 Cal.4th 483, 506-507; *People v. Michaels*, *supra*, 28 Cal.4th at pp. 511-512.)

Moreover, the claim is without merit. Defendant relies on the italicized passage in which Detective Theuer pressed him to confess to the rape of Regina M. "THEUER: We, we have the right guy. You know that. [¶] SCOTT: I don't . . . [¶] . . . and we know that. [¶] SCOTT: I don't, I didn't do it. What am I gonna tell you, I didn't do it. [¶] THEUER: You have to tell us what happened that night. If you tell us the truth, what happened that night, why you did it, how you did it . . . [¶] SCOTT: I'm trying to tell you . . . [¶] THEUER: . . . then we'll get this thing over with. Well look, we'll get it over with . . . [¶] SCOTT: *I don't, I don't want it, I don't wanna . . .*" (Italics added.) Read in context, the statement that defendant asserts was an invocation of his right to remain silent appears to be simply a repeated refusal to admit his guilt. As soon as the subject was changed, defendant readily continued to respond to questions. "[¶] THEUER: How old are you? [¶] SCOTT: Twenty-two." Such conduct is completely inconsistent with his belated claim that he wanted to end the interview. At no time did defendant decline to speak, ask to end the interview, or seek counsel.

### 3. Validity of the Search Warrant

#### a. Affidavit's showing of probable cause

Pursuant to a warrant, the police searched the residence of defendant and his housemates. In his bedroom, officers found a letter addressed to Regina M., Joseph C.'s paramedic identification, three newspaper clippings concerning the Kenny murder, and another clipping of a rape and murder in Moreno Valley. (*Ante*, pts. I.A.1., 3. & 4.) A wallet containing a photograph of Julia K. and

34

Joseph C., as well as defendant's identification cards, were found in the living room. (*Ante*, pt. I.A.4.) In the garage, officers found the silver automatic pistol that fired the shot at Howard Long (*ante*, pts. I.A.4. & 6.) and a sword similar to the one used by Joseph C.'s assailant (*ante*, pt. I.A.4.). They also found other ninja paraphernalia reported by one or more of the victims, including split-toed booties, darts, and black gloves with gray duct tape on the fingers. (*Ante*, pts. I.A.3. & 4.)

"In reviewing a search conducted pursuant to a warrant, an appellate court inquires 'whether the magistrate had a substantial basis for concluding a fair probability existed that a search would uncover wrongdoing.' (*People v. Kraft* (2000) 23 Cal.4th 978, 1040, citing *Illinois v. Gates* (1983) 462 U.S. 213, 238-239.) 'The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him [or her], including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.' (*Illinois v. Gates, supra*, 462 U.S. at p. 238.) The magistrate's determination of probable cause is entitled to deferential review. (*People v. Kraft, supra*, 23 Cal.4th at p. 1041, citing *Illinois v. Gates, supra,* 462 U.S. at p. 236.)" (*Carrington*, *supra*, 47 Cal.4th at p. 161.) Probable cause sufficient for issuance of a warrant requires a showing in the supporting affidavit that makes it substantially probable that there is specific property lawfully subject to seizure presently located in the particular place for which the warrant is sought. (*Id.* at p. 161; *People v. Frank* (1985) 38 Cal.3d 711, 744.)

Defendant contends the affidavit supporting the warrant here was insufficient because it did not establish the reliability of the informant. To the contrary, we have determined that Ricardo Decker was a reliable citizen informant

35

(*ante*, pt. II.B.1.a.). Detective Heredia's affidavit provided an adequate basis for the magistrate to reach the same conclusion and to conclude further that there was probable cause for the issuance of the warrant. The affidavit stated that Detective Heredia had been informed by Detective Keers that the telephone tipster was an adult coworker of defendant's, he was not in custody or a suspect, and he appeared responsible and credible.[25] According to the affidavit, Decker stated in his telephone call that he had last seen defendant on January 17, 1993, "dressed as a 'ninja,' carrying a sword, a long knife and a gun of some type." Decker told Keers essentially the same thing and he added that defendant told him he had "recently stabbed someone." The affidavit's catalogue of offenses attributed to the suspect included the stabbing of Phillip Courtney on January 18, 1993. In his telephone call, Decker said that defendant was "half black, half Japanese, 6'1" to 6'2"." In his affidavit, Detective Heredia stated that the suspect was usually described as a black male, possibly also of Asian heritage, between 5'11" and 6'2". In the phone call, Decker stated that defendant "traveled frequently on foot between the Canyon Crest area of the City of Riverside and the City of Moreno Valley." The affidavit listed the addresses of the offenses attributed to the suspect in Riverside and Moreno Valley. Finally, the affidavit recites that after being arrested, defendant admitted to Detective Heredia that he lived at the residence to be searched and that he "possessed a .45 caliber semi-auto pistol, a 'ninja' uniform, including a hood,

---

[25] Decker was not identified by name in Detective Heredia's affidavit. Detective Keers informed Heredia that she had spoken to a person who admitted he was the anonymous telephone informant. Keers further informed Heredia that, "The citizen contact is an adult and appears to be [a] responsible and credible person. The citizen informant is neither in custody nor a suspect. That the citizen informant had seen David Scott, a fellow employee, in a 'ninja' uniform at work on Sunday, 1-17-93. That the citizen informant had been told by David Scott that he had recently stabbed someone."

36

shirt, pants, a sword, 'ninja' darts (nails) and home-made throwing stars." The affidavit indicated that the suspect possessed all of these items when committing one or more of the offenses.

*b. Denial of evidentiary hearing on motion to traverse*

Defendant moved to traverse the search warrant on the ground that material information was omitted from the affidavit. The trial court denied the motion without conducting an evidentiary hearing. Defendant contends this was error. The contention fails.

A defendant has a limited right to challenge the veracity of statements contained in an affidavit of probable cause made in support of the issuance of a search warrant. The trial court must conduct an evidentiary hearing only if a defendant makes a substantial showing that (1) the affidavit contains statements that are deliberately false or were made in reckless disregard of the truth, and (2) the affidavit's remaining contents, after the false statements are excised, are insufficient to support a finding of probable cause. Innocent or negligent misrepresentations will not support a motion to traverse. (*Franks v. Delaware* (1978) 438 U.S. 154, 154-156; *People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 988-989.) A defendant who challenges a search warrant based on *omissions* in the affidavit bears the burden of showing an intentional or reckless omission of material information that, when added to the affidavit, renders it insufficient to support a finding of probable cause. (See *People v. Avalos* (1996) 47 Cal.App.4th 1569, 1581-1582; *People v. Souza* (1993) 18 Cal.App.4th 549, 562-563.) In either setting, the defendant must make his showing by a preponderance of the evidence, and the affidavit is presumed valid.

The alleged material omission involves defendant's "dream" about the Kenny murder. Detective Heredia's affidavit did not mention it. Defendant

contends this omission was material because the informant Decker gave conflicting reports of how he learned of the dream. (1) In the phone call, Decker mentioned the dream and reported that defendant told him of it. (2) In his interview with Detective Keers, Decker reported that he heard of the dream from Stephanie Compton.

Defendant failed to make the required substantial showing that Detective Heredia omitted this information with the deliberate intention to create a false impression or with reckless disregard for the truth. The record reveals that Detective Heredia did *not* intentionally omit information concerning the dream from his affidavit. To the contrary, it establishes that he was unaware of it when he prepared the affidavit. At a subsequent hearing on defendant's motion to suppress his statements as involuntary, Detective Heredia was cross-examined by defense counsel concerning Decker's call. Heredia testified that he forwarded the message to Detective Keers without listening to most of it because he was leaving the office when he received it. He said that he did not recall anything about a dream. The only part of the message he recalled was the suspect's name, Social Security number, and place of employment. He listened to the entire message later, but only after the search warrant had been served.

Moreover, including the conflicting information concerning the dream would not have undermined the showing of probable cause to issue the warrant. As we have earlier observed, Ricardo Decker, the citizen informant, gave Detective Keers a satisfactory explanation for the discrepancy: "[H]e had participated in numerous conversations with defendant and Compton, 'and he wasn't sure exactly who told him what portions.'" Regardless of whether Decker learned of the alleged dream from defendant or through Compton, the dream supported the conclusion that there was probable cause to arrest defendant. (*Ante*,

38

pp. 25-26.) If anything, including the dream in the affidavit would have bolstered the showing of probable cause.

### c. *Probable cause to seize certain items*

Here, the search warrant authorized the seizure of, among other specified items, "a paramedic identification card in the name of Joseph [C.]" and "any documents or articles in the name of [Regina M.]."[26] The police did seize such items. They found Joseph C.'s paramedic identification card in a briefcase on defendant's bed. (*Ante*, pt. I.A.4.) A letter addressed to Regina M. was found in defendant's bedroom. (*Ante*, pt. I.A.3.) Defendant contends the trial court erred in admitting this evidence because the affidavit supporting the warrant did not mention Joseph C. or Regina M. by name. The contention lacks merit.

A search warrant must "particularly describ[e] the place to be searched and the persons and things to be seized." (U.S. Const., 4th Amend; Cal. Const., art. I, § 13; see also § 1525.) The purpose of the particularity requirement is to prevent general searches. (*Maryland v. Garrison* (1987) 480 U.S. 79, 84; *People v. Farley* (2009) 46 Cal.4th 1053, 1099; *People v. Amador* (2000) 24 Cal.4th 387, 392.) Whether a warrant's description of property to be seized is sufficiently specific is a question of law subject to independent review by an appellate court. (*People v. Farley*, *supra*, 46 Cal.4th at p. 1099; *People v. Kraft* (2000) 23 Cal.4th 978, 1041 (*Kraft*.)

In his affidavit, Detective Heredia stated that in his experience serial rapists tend to keep records of their crimes, including documents belonging to the victims. He summarized the crimes he was investigating. Perhaps out of privacy considerations, the summaries did not identify the victims by name. However, the

---

[26] The affidavit gives Joseph C.'s and Regina M.'s full last names. It misspells "Regina" as "Relina," a discrepancy defendant does not complain of.

summary relating to Regina M.'s rapes states that the victim's wallet was taken.[27] Likewise, the summary of the attacks on Julia K. and Joseph C. states that the suspect took the male victim's "picture i.d.," adding that the suspect told them he "used to be a paramedic."[28]

An affidavit in support of a search warrant is to be interpreted in a commonsense manner. (*United States v. Ventresca* (1965) 380 U.S. 102, 109; *People v. Richardson* (2008) 43 Cal.4th 959, 989.) The commonsense interpretation of this affidavit is that Joseph C.'s paramedic identification and Regina M.'s letter were among the items taken by the suspect during the crimes committed on the specified dates.

Moreover, " '[w]hen officers, in the course of a bona fide effort to execute a valid search warrant, discover articles which, although not included in the warrant, are reasonably identifiable as contraband, they may seize them whether they are initially in plain sight or come into plain sight subsequently, as a result of the officers' efforts.' (*Skelton v. Superior Court* (1969) 1 Cal.3d 144, 157.)" (*People v. Diaz* (1992) 3 Cal.4th 495, 563.) Joseph C.'s paramedic identification and

---

[27]  After giving the date and address, the affidavit's description of this offense states in pertinent part: "BMA wearing ninja garb enters first floor apt[.] via open kitchen window while lone WFA victim is sleeping in her bedroom. Suspect . . . is armed with a silver semi-auto[matic] handgun. . . . After having the victim give him her wallet . . . he sexually assaults the victim three times."

[28]  Again, after giving the date and address, the affidavit's description of this offense states in pertinent part: "MBA in ninja attire enters 2-story residence . . ., armed with a silver semi-auto[matic] pistol, knife, and a sword carried on his back. . . . Surprises lone WFA . . . . He sexually assaults the victim once. When the boyfriend gets home he brandishes his sword at him and then ties them both up. Suspect . . . goes through male victim's wallet[,] taking a picture i.d. He tells the victims he used to be a paramedic at one time. He hog-ties the male victim and gags him while he sexually assaults the female two more times."

Regina M.'s letter clearly did not belong to defendant or his housemates. Just as clearly, Detective Keers, who was one of the officers executing the search warrant, knew they belonged to defendant's victims and were "souvenirs" of his crimes. Keers had been assigned to the investigation of this series of crimes because she took charge of the Kenny crime scene.

The challenged evidence was properly seized and admitted.

## B. Guilt Phase Issues

### 1. Sufficiency of the Evidence of Special Circumstances

Defendant contends the evidence was insufficient to support the special circumstances finding that he murdered Ms. Kenny in the course of raping or attempting to rape her. [29]

"In reviewing a challenge to the sufficiency of the evidence, we do not determine the facts ourselves. Rather, we 'examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citations.] We presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.] [¶] The same standard of review applies to cases in which the prosecution relies primarily on

---

[29] Defendant casts the insufficiency of the evidence claim in constitutional terms, contending he was denied his "right to due process of law and a reliable determination of penalty under the Fifth, Eighth and Fourteenth Amendments to the United States Constitution." No separate constitutional discussion is required, or provided, when rejection of a claim on the merits necessarily leads to rejection of any constitutional theory or "gloss" raised for the first time here. (*People v. Loker* (2008) 44 Cal.4th 691, 704, fn. 7; *People v. Boyer* (2006) 38 Cal.4th 412, 441, fn. 17.)

circumstantial evidence and to special circumstance allegations. [Citation.] '[I]f the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding.' [Citation.] We do not reweigh evidence or reevaluate a witness's credibility. [Citation.]" (*Guerra*, *supra*, 37 Cal.4th at p. 1129; see *People v. Lindberg*, *supra*, 45 Cal.4th at p. 27.)

"A killing 'committed in the perpetration of, or attempt to perpetrate' one of several enumerated felonies, including rape, is first degree murder. [Citation.] The rape-murder special circumstance equally applies to a murder 'committed while the defendant was engaged in . . . the commission of, [or] attempted commission of' rape. [Citations.] Forcible rape is an act of sexual intercourse accomplished with a person not the spouse of the perpetrator against the person's will by means of force or violence. [Citations.] An attempt to commit rape has two elements: the specific intent to commit rape and a direct but ineffectual act done toward its commission. [Citation.] The act must be a direct movement beyond preparation that would have accomplished the crime of rape if not frustrated by extraneous circumstances. [Citation.] An actual element of the offense, however, need not be proven. [Citation.] [¶] Intent to commit rape is the intent to commit the act against the will of the complainant. [Citations.] A defendant's specific intent to commit a crime may be inferred from all of the facts and circumstances disclosed by the evidence. [Citations.]" (*Guerra*, *supra*, 37 Cal.4th at pp. 1129-1130, fn. omited.)

There was substantial evidence that defendant acted in accordance with a repeatedly employed plan and scheme that involved rape or attempted rape over a three-month period. The jury could reasonably conclude that defendant raped two other women, Regina M. and Julia K. He was discovered in the sleeping rooms of two more, Colleen Cliff and Regenia Griffin, and Cliff awoke to find him astride

42

her. Semen consistent with defendant's was found on Kenny's pants, just as it was found on the Regina M.'s pajama bottoms. Defendant had Regina M. strip her bed and rinse the sheet in the bathtub, just as Ms. Kenny's bed had been stripped and the sheets placed in the hamper.

Defendant objects that no semen was found on Ms. Kenny's body. However, the fact that defendant had both Regina M. and Julia K. clean themselves after raping them strongly suggests he may have done the same with Kenny. As Regina M. put it, "he made me wipe myself with a towel so that there . . . would be no evidence. And he made me wash the towel." Defendant claims the fact that Kenny was found clothed leads inescapably to the conclusion that her clothes "were never removed at all, making vaginal penetration impossible." Attempted rape, of course, does not require penetration. (See, e.g., *Guerra*, *supra*, 37 Cal.4th at p. 1130.) Moreover, defendant's argument is inconsistent with his modus operandi. He had Regina M. change from her sleepwear to a business suit, then strip, put the suit back on, then strip again before raping her. After his initial rape of Julia K., he had her change from a sweater to a teddy and raped her twice more.

## 2. *Work Product Privilege*

The testimony of prosecution witnesses established that a bullet removed from Howard Long's doorframe was fired by the pistol found in defendant's garage. (*Ante*, pt. I.A.7.) Defendant contends the trial court prejudicially erred by permitting the prosecution to inquire, over his objection, whether the bullet had been in the possession of a defense expert. Defendant claims this line of inquiry violated his attorney work product privilege as well as his rights to a fair trial and the assistance of counsel under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution. His claims fail.

The fact that the bullet had been in the possession of a defense expert did not implicate the attorney work product privilege. In *People v. Bennett* (2009) 45 Cal.4th 577, 592, the defendant contended that the "prosecutor committed misconduct during the guilt phase of the trial when, in the course of examining a prosecution witness, she implied defendant could, and should, have had the DNA evidence retested. Defendant argues reversal is required because his rights under state law and the Fifth, Sixth, and Fourteenth Amendments to the federal Constitution were violated." The defendant argued that "the prosecutor violated the work product privilege by asking questions that sought to invade defense counsel's impressions or thought process." (*Id*. at p. 595.) This court disagreed. "In rejecting a nearly identical claim, we recently explained that section 1054.6 provides that the privilege applies in criminal cases only to materials or information that are work product as defined in Code of Civil Procedure section 2018.030, subdivision (a). (*People v. Zamudio* (2008) 43 Cal.4th 327, 351-356.) That subdivision defines work product as a '*writing* that reflects an attorney's impressions, conclusions, opinions, or legal research or theories.' (Code Civ. Proc., § 2018.030, subd. (a), italics added.) The prosecutor's questions at issue here merely sought to clarify that, contrary to defense counsel's implication, DNA samples were available for independent testing. As such, the prosecutor's questions did not elicit or attempt to elicit evidence of a 'writing' reflecting defense counsel's 'impressions, conclusions, opinions, or legal research or theories' and therefore did not violate the work product privilege." (*Id*. at p. 595, fn. omitted.) The mere fact that a piece of evidence was given to the defense says nothing about what the defense team did or did not do with the evidence. Our rejection of defendant's work product claim on the merits necessarily leads to rejection of his constitutional claims. (*People v. Zamudio*, *supra*, 43 Cal.4th at p. 355, fn. 15.)

### 3. Admissibility of evidence of habit

Todd Wolf, like defendant, was a member of the New Wine Fellowship Church. Wolf testified that he and his wife took defendant into their home because he was living on the street, but later asked him to leave. The prosecutor asked Wolf why. Defense counsel objected the reason was irrelevant. The prosecutor responded it was relevant because it tended to establish defendant's habit of roaming about late at night. He said Wolf would testify that he asked defendant to leave because he stayed out late at night and ignored Wolf's requests that he not do so. Defense counsel argued it was, nevertheless, irrelevant because this occurred "several months" before the crimes on trial. The objection was overruled. Wolf testified he asked defendant to leave because, despite his requests to the contrary, defendant repeatedly "stay[ed] out too late."

On appeal, defendant again contends that his habit of staying out late was irrelevant because he lived with the Wolfs months before these crimes were committed. Relevant evidence is evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) The trial court has broad latitude in determining the relevance of evidence. (*People v. Richardson, supra,* 43 Cal.4th at p. 1001; *People v. Carter* (2005) 36 Cal.4th 1114, 1166-1167.) We review such determinations for abuse of discretion. (*People v. Richardson*, *supra*, 43 Cal.4th at p. 1001; *People v. Ledesma* (2006) 39 Cal.4th 641, 701.) We find no abuse of discretion here. The fact that defendant tended to stay out late at night, and refused to modify his behavior on request, was relevant. This series of offenses was committed at night and some offenses continued into the early morning hours. The fact that the particular period about which Wolf testified predated the offenses was a factor going to the weight, not the admissibility, of the evidence.

Defendant objects that this evidence, even if relevant, was more prejudicial than probable.

A trial court may exclude otherwise relevant evidence when its probative value is substantially outweighed by concerns of undue prejudice, confusion, or consumption of time. (Evid. Code, § 352; *People v. Riggs* (2008) 44 Cal.4th 248, 290 (*Riggs*).) " ' "Prejudice" as contemplated by [Evidence Code] section 352 is not so sweeping as to include any evidence the opponent finds inconvenient. Evidence is not prejudicial, as that term is used in a section 352 context, merely because it undermines the opponent's position or shores up that of the proponent. The ability to do so is what makes evidence relevant. The code speaks in terms of *undue* prejudice. Unless the dangers of undue prejudice, confusion, or time consumption " 'substantially outweigh' " the probative value of relevant evidence, a section 352 objection should fail. (*People v. Cudjo* (1993) 6 Cal.4th 585, 609.) " 'The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying section 352, "prejudicial" is not synonymous with "damaging." ' [Citation.]" (*People v. Karis* (1988) 46 Cal.3d 612, 638.) [¶] The prejudice that section 352 " 'is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence.' [Citations.] 'Rather, the statute uses the word in its etymological sense of "prejudging" a person or cause on the basis of extraneous factors. [Citation.]' [Citation.]" (*People v. Zapien* (1993) 4 Cal.4th 929, 958.) In other words, evidence should be excluded as unduly prejudicial when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction. In such a circumstance, the evidence is unduly prejudicial because of the substantial

likelihood the jury will use it for an illegitimate purpose.' (*Vorse v. Sarasy* (1997) 53 Cal.App.4th 998, 1008-1009.)" (*People v. Doolin* (2009) 45 Cal.4th 390, 438-439.)

On appeal, we review the trial court's rulings on the admissibility of evidence for abuse of discretion. (*Riggs*, *supra*, 44 Cal.4th at p. 290; *People v. Thornton* (2007) 41 Cal.4th 391, 444-445; *People v. Pollock* (2004) 32 Cal.4th 1153, 1171.) No abuse occurred. That defendant stayed out late while living with the Wolfs was not unduly prejudicial.[30] Indeed, defendant made a much more damaging admission to the police in this regard: that he practiced his martial arts at night, in a ninja outfit, in the Riverside Canyon Crest area and Moreno Valley.

Finally, the argument borders on the frivolous. The jury heard evidence that defendant broke into homes, repeatedly raped, threatened his victims with deadly weapons, stabbed one man, shot at another, and murdered a young woman. In light of this evidence, it defies logic that the jury would be pushed beyond its ability to dispassionately evaluate the evidence because it learned that defendant stayed out late.

### 4. Admissibility of evidence that defendant knifed a coworker

The prosecutor asked Matthew Texera, one of defendant's coworkers, whether anything unusual had happened between them. Defense counsel objected. The prosecutor stated that Texera would testify that defendant crept up behind him and swung a knife at him, cutting his hand. Defense counsel argued that Texera's testimony would be irrelevant and, if relevant, unduly prejudicial. The objection was overruled on the grounds that the incident revealed that defendant had access

---

[30] Defendant's assertion that "[t]he obvious purpose of this improper inquiry was to create the impression in the minds of the jurors that [defendant] was predisposed to violence" is simply baseless.

to a knife and attacked with stealth. "As far as [Evidence Code section] 352 goes, I don't think there's undue prejudice here that outweighs probative value." Texera testified consistently with the proffer.

Defendant now contends the testimony should have been excluded as inadmissible propensity evidence under Evidence Code section 1101 subdivision (a).[31] We need not reach this question because it is not reasonably possible that the verdict was affected by Texera's testimony. Defendant's interest in and access to cutting and stabbing weapons was well established. Defendant told police he "trained" with a "ninja sword." He told coworker Ricardo Decker that he "had had to stab several people" in the past. Stephanie Compton gave defendant one sword and had seen another in his house. Moreover, the sword used to threaten Julia K. and Joseph C. resembled a sword found in defendant's garage, as did the sword Scott Clifford saw in the possession of the prowler. Given this evidence, as well as the strength of the evidence identifying defendant as the perpetrator in each of the charged crimes involving a cutting or stabbing instrument, there was no reasonable possibility the Texera incident affected the verdict.

---

[31] Evidence Code section 1101 provides: "(a) Except as provided in this section and in Sections 1102, 1103, 1108, and 1109, evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion. "(b) Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act.
"(c) Nothing in this section affects the admissibility of evidence offered to support or attack the credibility of a witness."

## 5. *Rape victim's testimony that she had recently given birth*

Before calling Julia K., one of the rape victims (*ante*, pt. I.A.5.), the prosecutor advised the court that Julia K. had given birth to a baby three days earlier and had been discharged from the hospital only the night before. The baby remained in the hospital. Julia was experiencing "a lot of obvious discomfort" and might need "frequent breaks." The prosecutor wished to ask her certain leading questions to establish this, so that the jury would not think she had "a poor attitude toward the proceedings." "[I]n case she starts getting fidgety or nervous, I don't want the jury to think she is maybe not being responsive to defense counsel or me . . . ." The prosecutor was permitted to ask four questions in this regard, and Julia answered "yes" to each of them. (1) Did she have a baby three days ago? (2) Was she discharged from the hospital the previous night? (3) Was her baby still in the hospital? (4) Did she wish to "just get this over with this morning . . .?"

Defense counsel objected that Julia's recent childbirth was irrelevant, and that mention of it would be prejudicially elicit sympathy from the jury. The objection was overruled. To forestall a sympathetic reaction, the court said it would tell the jury that "they should evaluate her testimony without feelings of prejudice or sympathy for or against either side just because of the fact she has gone through childbirth recently, but that that information was provided so that they would understand her present medical and psychological condition."

On appeal, defendant contends the fact that "[Julia] recently gave birth and her baby was still in the hospital is of absolutely no relevance to any issue in the trial." However, as the trial court noted, a witness's "demeanor is always relevant to credibility." (Evid. Code, § 780, subd. (a); *Elkins v. Superior Court* (2007) 41 Cal.4th 1337, 1358.) As the court further observed, absent an explanation of Julia's medical condition, the jury might have concluded that she was "not being

49

forthright or doesn't want to answer questions or is not able to." Defendant asserts there was no indication Julia was "so physically uncomfortable that her testimony would have been affected . . . ." To the contrary, the court noted that she had to use a "donut" cushion as she sat in the witness box.

Defendant's assertion that the court did not deliver the promised instruction is simply false. At the conclusion of Julia C.'s testimony, the court instructed the jury as follows: "[T]he court allowed the questions . . . concerning her giving birth to the child recently . . . so that you would be aware of her present physical and emotional condition as it may bear on her ability to testify, and that you should not consider those factors concerning the birth of the child for any purpose other than that and should not give any consideration as to either sympathy for or bias against either side." There was no error.

### 6. Instructions on Circumstantial Evidence

Defendant contends that the standard instructions on circumstantial evidence, which use the phrase "appears to you to be reasonable," undermine the constitutional requirements of proof beyond a reasonable doubt. We have repeatedly rejected the argument and continue to do so. (*People v. Nelson* (2011) 51 Cal.4th 198, 216 (*Nelson*); *People v. Horning* (2004) 34 Cal.4th 871, 910; *Maury*, *supra*, 30 Cal.4th at p. 428.)

### C. Penalty Phase Issues

#### 1. Victim Impact Evidence

As previously stated, Brenda Kenny's father, mother, brother, sister, and brother-in-law testified about the impact of her murder on themselves and one another. (*Ante*, pt. I.B.1.)

Defendant contends that much of the victim impact evidence should have been excluded because it had "little to do with the uniqueness of Ms. Kenny as a person. Instead, it related to the psychological reactions of the Kenny family."

Defendant's premise is false. He argues that one aspect of victim impact evidence is the only kind permissible. The argument is contrary to precedent. Victim impact evidence is not limited to the victim's "uniqueness . . . as a person." To the contrary, unless it invites a purely irrational response, evidence of the effect of a capital murder on the victim's loved ones and the larger community is admissible under section 190.3, factor (a) as a circumstance of the crime. (*People v. Brady* (2010) 50 Cal.4th 547, 574 (*Brady*); *People v. Burney* (2009) 47 Cal.4th 203, 258 (*Burney*); *People v. Bramit* (2009) 46 Cal.4th 1221, 1240 (*Bramit*).)

The evidence admitted here was "typical" of the victim impact evidence "we routinely have allowed." (*Burney*, *supra*, 47 Cal.4th 203, 258.) In *Burney*, members of the victim's family and his fiancée testified about the "deleterious impact of the victim's murder on themselves and others, how much they missed the victim, and the victim's sweet and peaceful nature." (*Id.* at p. 258.) In *People v. Boyette* (2002) 29 Cal.4th 381, "[f]amily members spoke of their love of the victims and how they missed having the victims in their lives." (*Id.* at p. 444.) "Nor are victim impact witnesses limited to expressions of grief, for our case law permits a showing of 'the specific harm caused by the defendant' (*People v. Edwards* [(1991)] 54 Cal.3d [787,] 835), which encompasses the spectrum of human responses, including anger and aggressiveness [citation], fear [citation], and an inability to work [citation]." (*People v. Ervine* (2009) 47 Cal.4th 745, 793.) In *People v. Panah*, (2005) 35 Cal.4th 395, we held there was no error in the admission of evidence that the victim's brother, an athlete and excellent student, started using drugs after her murder. (*Id.* at pp. 494-495.) There is also no merit to defendant's claim that the testimony of the five members of Ms.

Kenny's family should have been excluded as "cumulative" and "repetitive." Victim impact evidence is commonly provided by several family members, colleagues, or friends. For example, in *Brady*, *supra*, 50 Cal.4th 547, four of the slain officer's sisters, his fiancée, two fellow officers, and his police chief testified. (*Id*. at p. 573.) Finally, "[t]here is no requirement that family members confine their testimony about the impact of the victim's death to themselves, omitting mention of other family members." (*Panah, supra,* 35 Cal.4th at p. 495.)

### 2. Cumulative Error

Defendant contends the cumulative effect of guilt and penalty phase errors requires reversal of his death sentence. In light of our consideration of his claims there was no prejudicial error to accumulate.

### 3. Death Penalty Law and Instructions

Defendant raises a series of challenges to California's death penalty law and the standard CALJIC sentencing instructions. In addition to the other cases cited, we recently rejected each of these challenges in *Nelson*, *supra*, 51 Cal.4th at pp. 225 -227. We reaffirm our holdings.

California's grant of discretion to prosecutors to decide in which cases to seek the death penalty is constitutional. (*People v. Gamache* (2010) 48 Cal.4th 347, 406 (*Gamache*); *Burney, supra,* 47 Cal.4th at p. 268; *People v. Brown* (2004) 33 Cal.4th 382, 403.)

Section 190.3, factor (a), which permits the jury to consider the circumstances of the crime in deciding whether to impose the death penalty, does not license the arbitrary and capricious imposition of the death penalty. (*Tuilaepa v. California* (1994) 512 U.S. 967, 975-976; *People v. D'Arcy* (2010) 48 Cal.4th 257, 308 (*D'Arcy*); *People v. Cruz* (2008) 44 Cal.4th 636, 680 (*Cruz*).)

California homicide law and the special circumstances listed in section 190.2 adequately narrow the class of murderers eligible for the death penalty. (*Gamache*, *supra*, 48 Cal.4th at p. 406; *People v. Barnwell* (2007) 41 Cal.4th 1038, 1058 (*Barnwell*).)  Specifically, the felony-murder special circumstance (§ 190.2, subd. (a)(17)) is not overbroad and adequately narrows the pool of those eligible for death.  (*Gamache*, *supra*, 48 Cal.4th at p. 406; *Kraft*, *supra*, 23 Cal.4th at p. 1078.)

Nothing in the federal Constitution requires the penalty phase jury to make written findings of the factors it finds in aggravation and mitigation; agree unanimously that a particular aggravating circumstance exists; find all aggravating factors proved beyond a reasonable doubt or by a preponderance of the evidence; find that aggravation outweighs mitigation beyond a reasonable doubt; or conclude beyond a reasonable doubt that death is the appropriate penalty.  (*Burney*, *supra*, 47 Cal.4th at pp. 267-268; *People v. Williams* (2008) 43 Cal.4th 584. 648-649.)  This conclusion is not altered by the United States Supreme Court's decisions in *Apprendi v. New Jersey* (2000) 530 U.S. 466 (*Apprendi*), *Ring v. Arizona* (2002) 536 U.S. 584, and *Blakely v. Washington* (2004) 542 U.S. 296.  (*D'Arcy*, *supra*, 48 Cal.4th at p. 308; *Carrington*, *supra*, 47 Cal.4th at p. 200; *People v. Mendoza* (2007) 42 Cal.4th 686, 707.)

CALJIC Nos. 8.84.1 and 8.85, in directing the jury during the penalty phase to determine what the facts are from the evidence received during the entire trial, does not unconstitutionally allow the consideration of nonstatutory aggravating circumstances in the determination of penalty.  (*People v. Ramirez* (2006) 39 Cal.4th 398, 474; *People v. Harris* (2005) 37 Cal.4th 310, 359; *People v. Champion* (1995) 9 Cal.4th 879, 946.)

The trial court need not label the statutory sentencing factors as either aggravating or mitigating, nor instruct the jury that the absence of mitigating

factors does not constitute aggravation. (*D'Arcy*, *supra*, 48 Cal.4th at p. 308; *People v. Watson* (2008) 43 Cal.4th 652, 704; *People v. Cunningham* (2001) 25 Cal.4th 926, 1041.)

The use in the sentencing factors of the phrases "*extreme* mental or emotional disturbance" (§ 190.3, factor (d), italics added) and "*extreme* duress or . . . *substantial* domination of another" (*id.*, factor (g), italics added) does not inhibit the consideration of mitigating evidence or make the factors impermissibly vague. (*Bramit*, *supra*, 46 Cal.4th at p. 1249; *People v. Bunyard* (2009) 45 Cal.4th 836, 861 (*Bunyard*); *People v. Lewis* (2008) 43 Cal.4th 415, 532.)

The jury may properly consider unadjudicated criminal activity at the penalty phase and need not make a unanimous finding on each instance of such activity. (*D'Arcy*, *supra*, 48 Cal.4th at p. 308; *People v. Elliot* (2005) 37 Cal.4th 453, 488; *People v. Morrison* (2004) 34 Cal.4th 698, 729.) *Apprendi* and its progeny do not compel a different result. (*D'Arcy* at p. 308; *Bunyard*, *supra*, 45 Cal.4th at p. 861; *People v. Ward* (2005) 36 Cal.4th 186, 221-222.) Moreover, because no evidence of unadjudicated criminal activity was introduced in the penalty phase of this trial, there is no factual basis for this constitutional challenge.

Review for intercase proportionality is not constitutionally compelled. (*Pulley v. Harris* (1984) 465 U.S. 37, 42, 50-51; *Bramit*, *supra*, 46 Cal.4th at p. 1250; *People v. Butler* (2009) 46 Cal.4th 847, 885 (*Butler*).)

Because capital defendants are not similarly situated to noncapital defendants, California's death penalty law does not deny capital defendants equal protection by providing certain procedural protections to noncapital defendants but not to capital defendants. (*People v. Jennings* (2010) 50 Cal.4th 616, 690; *Cruz*, *supra*, 44 Cal.4th at p. 681; *People v. Johnson* (1992) 3 Cal.4th 1183, 1242-1243.)

The death penalty as applied in this state is not rendered unconstitutional through operation of international law and treaties.  (*People v. Mills* (2010) 48 Cal.4th 158, 215; *Butler*, *supra*, 46 Cal.4th at p. 885; *Barnwell*, *supra*, 41 Cal.4th at p. 1059.)

## III.  DISPOSITION

The judgment is affirmed.

CORRIGAN, J.

WE CONCUR:

CANTIL-SAKAUYE, C. J.
KENNARD, J.
BAXTER, J.
WERDEGAR, J.
CHIN, J.
AARON, J.*

_____

\*      Associate Justice, Court of Appeal, Fourth Appellate District, Division One, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Scott

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S068863
**Date Filed:** August 11, 2011

_____

**Court:** Superior
**County:** Riverside
**Judge:** William R. Bailey, Jr.

_____

**Counsel:**

Glen Niemy, under appointment by the Supreme Court, for Defendant and Appellant.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Holly D. Wilkens and Adrianne S. Denault, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Glen Niemy
P.O. Box 764
Bridgton, ME  04009
(207) 647-2600

Adrianne S. Denault
Deputy Attorney General
110 West A Street, Suite 1100
San Diego, CA  92101
(619) 645-2287