Filed 8/14/15  P. v. Olivares CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B252620 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA355041) |
| v. | |
| DIEGO OLIVARES, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Ronald S. Coen, Judge.  Reversed.

Charlotte E. Costan, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Lance E. Winters, Assistant Attorney General, Shawn McGahey Webb and Esther P. Kim, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Diego Olivares appeals from a judgment entered after a jury found him guilty of two counts of willful, deliberate and premeditated attempted murder and also found personal discharge of a firearm and gang enhancement allegations to be true. The jury did not reach a verdict on two special circumstance murder counts also charged in this case, and the trial court declared a mistrial as to those counts. Upon retrial of the murder counts, the jury acquitted Olivares. The court sentenced Olivares to life with a minimum parole eligibility term of seven years for one of the attempted murders, plus 25 years to life for the firearm enhancement on that count (and imposed a concurrent term for the other attempted murder).

Olivares contends the trial court abused its discretion in denying his motion to sever the murder counts from the attempted murder counts, and the joinder of the murder counts deprived him of his constitutional rights to due process and a fair trial on the attempted murder counts. Each alleged murder occurred on a different date and the two attempted murders occurred on a third date. Each murder involved circumstances very different from the other and very different from the attempted murders. The common thread was the allegation that each offense was gang-motivated. The only evidence that was cross-admissible on the murder and attempted murder counts was the gang evidence. The contested evidence presented at trial regarding Olivares's identity as the perpetrator was not overwhelming as to any of the counts. For these and other reasons explained below, we agree with Olivares that the trial court erred in denying his motion to sever the murder counts from the attempted murder counts and the error was prejudicial. Accordingly, we reverse the judgment.

## BACKGROUND

**Charges**

In an information, filed September 16, 2010, the Los Angeles County District Attorney charged Olivares and codefendant Michael Wayne Thompson with the April 3, 2004 murder of Erica Carpinteyro (count 1) and the May 27, 2004 murder of Michael Johnson (count 2). The district attorney alleged a special circumstance under Penal Code

2

section 190.2, subdivision (a)(3),[1] because defendants were charged with more than one murder. The district attorney further alleged firearm (§ 12022.53, subds. (b)-(e)(1)) and gang (§ 186.22, subd. (b)) enhancements as to the murder counts. Evidence presented at the preliminary hearing and at trial demonstrated Olivares and Thompson were members of the Four Trey Gangster Crips criminal street gang, which Olivares does not dispute.

The September 16, 2010 information also charged Olivares (but not codefendant Thompson) with the May 23, 2004 willful, deliberate and premeditated attempted murders of Cecillio Moreno (count 3) and Faustino Olivar (count 4). As to these attempted murder counts, the district attorney alleged firearm (§ 12022.53, subds. (b)-(e)(1)) and gang (§ 186.22, subd. (b)) enhancements. At the time of the charged murders and attempted murders, Olivares was 16 years old and codefendant Thompson was 23.

**Motion to Sever Counts**

On September 23, 2011, Olivares, who was then 23 years old and representing himself in propria persona, filed a pretrial motion to sever the murder counts from the attempted murder counts. In the 44-page, handwritten motion, Olivares summarized the evidence presented at the preliminary hearing and explained why the counts should be severed.[2] Olivares had represented himself at the preliminary hearing and had cross-examined the witnesses.

As set forth in the motion, count 1 charged Olivares and codefendant Thompson with the April 3, 2004 murder of Erica Carpinteyro, a four-year-old child who was sitting in a parked car with her brother and father at approximately 8:00 p.m., waiting for her mother to come out of a store, when a bullet fired from outside the car entered the car and struck the child in the head. Travis Hardy, a former Four Trey gang member who

---

[1] Further statutory references are to the Penal Code.

[2] We summarize the relevant preliminary hearing evidence, as Olivares did in his motion to sever counts, because, in deciding whether the trial court abused its discretion in denying the motion, "we examine the record before the trial court at the time of its ruling." (*People v. McKinnon* (2011) 52 Cal.4th 610, 630.)

3

testified at the preliminary hearing (and later at trial), contacted the Los Angeles Police Department in 2009, several years after the crime, to report Olivares and Thompson were the shooters. According to Hardy, Olivares and Thompson left a "Hood Day" celebration (party for the gang) at Gilbert Lindsay Park, stating they were "going to put in some work" or shoot to kill rival gang members. Less than an hour later, Olivares and Thompson returned to the park with guns in their hands stating they had shot somebody but "fucked up and shot a kid."

As Olivares also explained in the motion, count 2 charged Olivares and Thompson with the May 27, 2004 murder of Michael Johnson, a Four Deuce/Four Trey Gangster Crips gang member[3] who was shot in the head and chest purportedly because he was a "snitch." Erica Murray, a fellow Four Deuce gang member, testified at the preliminary hearing (and later at trial) that victim Johnson left her grandfather's house in the evening with Olivares and Thompson. Shortly thereafter, Murray received a telephone call informing her Johnson had been killed. Murray went to the crime scene and saw Johnson's body in the street. Three weeks later, Murray was at a gang "hangout" and had an argument with Thompson regarding Johnson's death. Murray was upset because she had heard Thompson killed Johnson. When she asked Thompson about it, he responded, "when a nigger snitches, he gets dealt with."

Finally, Olivares summarized in his motion to sever the evidence presented at the preliminary hearing supporting count 3 (the attempted murder of Cecillio Moreno) and count 4 (the attempted murder of Faustino Olivar), the only two counts on which Olivares was later convicted. The victims were shot in the late afternoon on May 23, 2004 at Gilbert Lindsay Park, after a scuffle between two groups of people. Inelvia Solano, who testified at the preliminary hearing (and later at trial), stated she was picnicking at the park with family and friends when she saw a group of "three people" she described as

---

[3] Evidence presented at the preliminary hearing and at trial established that Four Deuce and Four Trey were essentially the same gang.

"Blacks and Latins" chasing her husband's nephew, Jose, through the park.[4] She alerted her husband, Genaro Huerta, stating she believed the three people were going to hit Jose. Huerta confronted the group and told them not to hit Jose. The group, which now included five individuals, turned on Huerta, hitting him and snatching his gold chain from his neck. Huerta's family and friends, including Moreno and Olivar, came forward to defend him. A few more African-American people joined the group that was scuffling with Huerta and his family and friends. Solano saw a man with a gun, whom she identified at the preliminary hearing as Olivares. According to Solano, Olivares tried to shoot the gun, but it did not fire. The second time he tried, the gun fired and the bullet hit Moreno in the stomach. Solano heard two more shots, and bullets struck Olivar's hand.

As set forth in Olivares's motion, Eric Ranson also testified at the preliminary hearing. (He further testified later at trial.) Ranson stated at the preliminary hearing that he saw Olivares holding a gun down at his side around the time of the May 23, 2004 shooting at Gilbert Lindsay Park, but he did not see Olivares point the gun at anyone or shoot it. Ranson, who was 12 years old at the time of the shooting and 18 at the time of the preliminary hearing, was skating at the park when he heard gunshots. He did not witness the shooting. Nonetheless, he told officers the shooter was "Diego" from Four Trey Gangster Crips, and identified Diego (Olivares) in a six-pack photographic lineup. According to Ranson, Olivares was the only Hispanic person he knew who belonged to the Four Trey Gangster Crips.

Rudy Huerta, son of Inelvia Solano and Genaro Huerta, also testified at the preliminary hearing (and later at trial). He stated at the preliminary hearing that he was at Gilbert Lindsay Park on May 23, 2004, and saw a group of people, including African-American and Hispanic individuals, chase his cousin, Jose, and beat up his father, Genaro. Rudy ran toward Genaro as more African-American people joined the group

---

[4] The prosecution presented evidence at trial, but not at the preliminary hearing, that Olivares asked Jose about his gang affiliation ("'where are you from'") before Olivares and three other individuals began chasing Jose.

5

scuffling with Genaro. Rudy saw two males holding handguns, an African-American male who was in front of Rudy, and a Hispanic male who was behind Rudy. According to Rudy's preliminary hearing testimony, the Hispanic male "was having difficulty shooting. He was having trouble with the gun." It appeared to Rudy that the gun was "stuck" because he saw the Hispanic male pulling hard on the trigger but the gun was not shooting. Then Rudy heard gunshots and threw himself to the ground. When he looked up, he noticed that Olivar and Moreno were bleeding. Later in his testimony, Rudy stated he had seen the Hispanic male pointing the gun at Olivar and he saw the Hispanic male shoot the gun. Within two weeks of the shooting, officers showed Rudy a six-pack photographic lineup containing a photograph of Olivares. Rudy was unable to identify a suspect. The day before the preliminary hearing commenced—six years after the shooting—Rudy appeared in court so the judge could place him on call as a witness. He observed Olivares in the courtroom and told the prosecutor Olivares looked like the shooter. He confirmed this observation at the preliminary hearing.

Finally, in his motion to sever, Olivares summarized victim Faustino Olivar's preliminary hearing testimony. (Olivar also testified later at trial.) Olivar stated he was playing volleyball at Gilbert Lindsay Park on May 23, 2004, when he saw a group of around five African-American people beating up his uncle, Genaro Huerta. Olivar went to Huerta's aid. According to Olivar's preliminary hearing testimony, "Then, more Black people came and just started like shooting at us." Olivar saw an African-American man with a gun. The man aimed the gun at someone and tried to fire but "the gun got stuck." Olivar went to grab the man and was struck by gunfire. Olivar believed it was another man who shot him but he did not see another gunman other than the African-American man.

Olivares argued in his motion that all four factors courts consider in deciding whether to sever counts supported severance in this case.[5] First, he argued "the three

---

[5] "'The relevant factors are whether (1) the evidence would be cross-admissible in separate trials, (2) some charges are unusually likely to inflame the jury against the

6

shootings did not share sufficient common and distinctive marks to be admissible in the respective separate trial. Each episode occurred in a very different factual setting, [and] there is no similarity between the three incidents except for the inference that they all may have been . . . gang-related." Second, he argued the alleged circumstances of the murders—a four-year-old child gunned down in a gang shooting while strapped in her car seat, and a gang member shot in the head and chest because he was a snitch—were likely to inflame the jury against Olivares. Third, he argued the prosecutor joined three weak cases into one in order to obtain a conviction. Olivares noted the Los Angeles County District Attorney decided on July 16, 2004, after interviewing witnesses, that it would not file a case against Olivares for the May 23, 2004 shooting of Moreno and Olivar because the witnesses had been unable to identify Olivares as the suspect (as reflected in the police report included in the record on appeal). This case was filed more than six years later. Fourth, Olivares argued the murders were capital offenses given the special circumstance (multiple murder) allegation. Although Olivares was a minor at the time of the offenses, and not subject to the death penalty, codefendant Thompson was an adult. At the time Olivares made his motion, the prosecution had not decided whether to seek the death penalty against Thompson.

The prosecution did not file a written opposition to Olivares's motion to sever counts. On October 6, 2011, the trial court heard oral argument on the motion from Olivares (representing himself) and the prosecutor. The prosecutor argued the two murders should remain joined with the attempted murders because (1) there were allegations that all crimes were gang-motivated and the gang evidence would be cross-admissible; (2) Gilbert Lindsay Park was the scene of the attempted murders and there was evidence showing Olivares and Thompson were at Gilbert Lindsay Park just prior to the murder of four-year-old Erica Carpinteyro, so evidence of location would be cross-

---

defendant, (3) a weak case has been joined with a strong case, or with another weak case, so that the total evidence may unfairly alter the outcome on some or all charges, and (4) one of the charges is a capital offense, or joinder of the charges converts the matter into a capital case.'" (*People v. Scott* (2011) 52 Cal.4th 452, 469-470.)

7

admissible on counts 1, 3 and 4; (3) the "degree of crime" was similar for all offenses; (4) a firearm was used in each murder and attempted murder (although there is no evidence indicating the same firearm was used in more than one shooting); and (5) "the inflammatory nature of the charges is similar across all the counts." Olivares conceded murder and attempted murder are in "the same class of crimes" for purposes of section 954.1.[6]

The trial court denied Olivares's motion to sever counts, finding the evidence was "cross-admissible to show the intent of the shooter" because all of the crimes were alleged to be gang-motivated. The court further found "none of the factors weighing against joinder were present." After reviewing the preliminary hearing transcript, the court did not believe a "particular murder count is sufficiently strong or overwhelmingly strong to bring up another murder count or in any other count that is very, very weak." Nor did the court believe any count was "more likely to inflame the jury's passions than the other." The court concluded Olivares could not show joinder of counts was prejudicial.

Immediately after the trial court denied his motion to sever counts, Olivares gave up his pro. per. status and accepted representation by stand-by counsel. Olivares was represented by the same attorney through sentencing.

**Trial**

Trial commenced on May 22, 2012. The prosecution first presented evidence on counts 3 and 4, the May 23, 2004 attempted murders of Moreno and Olivar, which were charged only against Olivares and not codefendant Thompson.

---

[6] Section 954.1 provides: "In cases in which two or more different offenses of the same class of crimes or offenses have been charged together in the same accusatory pleading, or where two or more accusatory pleadings charging offenses of the same class of crimes or offenses have been consolidated, evidence concerning one offense or offenses need not be admissible as to the other offense or offenses before the jointly charged offenses may be tried together before the same trier of fact."

8

Inelvia Solano testified that on May 23, 2004—eight years before her trial testimony—she saw Olivares chase Jose, participate in a group beating of her husband, Genaro Huerta, and fire the bullets which struck Moreno and Olivar. Solano stated Olivares was the only person she saw with a gun. Solano also testified that, about a week after the shooting, officers came to her home and showed her an album containing a photograph of Olivares but she did not recognize Olivares as the shooter.[7]

Solano's son, Rudy Huerta, testified that on May 23, 2004, during the group beating involving his father, Genaro Huerta, he glanced behind him and saw Olivares "pulling on" a gun and having "trouble" with the gun. After Rudy faced forward again, he heard gunshots but could not discern the direction from which the bullets were fired. At the preliminary hearing, Rudy testified he also observed an African-American man standing in front of him holding a gun. At trial, however, he stated Olivares was the only person he saw with a gun. Within a few days of the shooting, officers showed Rudy a six-pack photographic lineup but he was unable to identify the person he had seen holding the gun.

Victim Faustino Olivar testified consistently with what he stated at the preliminary hearing (summarized above). In short, during the scuffle between the two groups, Olivar observed an African-American man with a gun. When the gun jammed, Olivar stepped in to subdue the man and felt bullets strike him. Olivar believed the bullets were fired from someplace else, but he did not see another gunman.

Solano's other son, Genaro Huerta (who has the same first and last names as his father), testified at trial but not at the preliminary hearing. Genaro (the son) was standing with Jose at Gilbert Lindsay Park when a man Genaro identified at trial as Olivares approached and asked Jose about his gang affiliation ("'where are you from'"). Olivares was with three other people. According to Genaro's trial testimony, Olivares attempted

---

[7] Olivares became a suspect on the day of the shooting. According to Officer Jennifer Grasso's trial testimony, at the crime scene, 12-year-old Eric Ranson told her "the male Hispanic shooter was Diego, also known as Santana, from Four Trey."

9

to pull a gun from the pocket of one of his associates, but the other male said, "'not right now'" or "'not yet.'" Then Olivares and the three other individuals began chasing Jose. During the subsequent scuffle involving several of his family members, Genaro heard gunshots but did not see who was shooting.

Eric Ranson, who was in custody for robbery at the time of trial, did not testify consistently with his preliminary hearing testimony (which is summarized above). He stated he did not know anything about the shooting, did not see a gun and did not know Olivares. Moreover, he denied telling officers the shooter was Diego from Four Trey and denied identifying Olivares in a six-pack photographic lineup, even after his recorded interview with officers was played for the jury.

The prosecution next presented its case on count 1, the April 3, 2004 murder of four-year-old Erica Carpinteyro. Travis Hardy, the former Four Trey gang member who came forward in 2009, several years after the crime, to identify Olivares and codefendant Thompson as the perpetrators, testified consistently with his preliminary hearing testimony (summarized above). Hardy testified he was in fear for his life because he was testifying against Four Trey gang members and the penalty for doing so could be death. Because Hardy feared for his safety, the Los Angeles Police Department (LAPD) paid to relocate Hardy to Las Vegas, Nevada.

Finally, the prosecution presented its case on count 2, the May 27, 2004 murder of Michael Johnson, who allegedly was killed because he had snitched on another gang member. Erica Murray, the fellow gang member who testified against Olivares and Thompson at the preliminary hearing (as summarized above) was unavailable at trial and her preliminary hearing testimony was read to the jury. Evidence presented at trial indicated Murray had received financial assistance from the LAPD for her cooperation.

Leighton Corothers, a Four Deuce/Four Trey gang member, also testified for the prosecution regarding Johnson's murder. At the time of trial, he was in custody for a bank robbery he had committed on July 1, 2004, eight years before his trial testimony. During his trial testimony in this case, Corothers identified Olivares and Thompson as his accomplices during the 2004 bank robbery. On October 9, 2005, Corothers's cellmate

10

wrote a letter for him to send to the district attorney's office handling his bank robbery case. Corothers signed the letter, in which he identified Thompson and Olivares as the individuals who had murdered Johnson. On January 9, 2006, detectives interviewed Corothers in prison about Johnson's murder. More than six years later, at the trial in this case, Corothers indicated he had fabricated the information in the letter to "get even with" Olivares and Thompson because he was angry that he was facing a third strike life sentence for the 2004 bank robbery and they were not. In 2009 or 2010, Corothers "became a born again Christian" and decided to tell the truth—that he had fabricated the information about Olivares and Thompson he included in the October 9, 2005 letter, and his January 9, 2006 interview with detectives.

Detective Tommy Thompson, one of the investigating detectives on this case, testified that in September 2007, while in custody, Gabriel Olea indicated Olivares murdered fellow gang member "Baby Left" (Johnson's gang moniker) because he was a snitch. Olea had been in a relationship with Olivares's sister and had two children with her. At trial, Olea testified and denied he had implicated Olivares in Johnson's murder.

The prosecution presented a gang expert (Officer Ronald Berdin) who testified about the Four Deuce/Four Trey Gangster Crips, a predominantly African-American gang. In 2004, Berdin was aware of only one Hispanic member of Four Deuce/Four Trey, Olivares. Rivals of Four Deuce/Four Trey included several neighboring African-American and Hispanic gangs. According to Berdin, Gilbert Lindsay Park was "the hub" of Four Deuce/Four Trey criminal activity. In response to the prosecutor's hypotheticals regarding the incidents charged in this case, Berdin testified each of the hypothetical murders and attempted murders was committed for the benefit of, at the direction of, and in association with a criminal street gang. Berdin testified about the penalties imposed on someone who is "labeled a snitch by the gang." After Michael Johnson was shot in the head and chest, Berdin learned Johnson had been "assisting a detective in a homicide investigation." Johnson's murder was consistent with the punishment a snitch would receive from the Four Trey gang, according to Berdin.

11

Olivares testified in his own defense at trial. He admitted prior juvenile convictions for possession of drugs for sale in 2002 and assault with force likely to produce great bodily injury in 2004. He also admitted his juvenile conviction for the July 1, 2004 robbery he participated in with Corothers and codefendant Thompson. He was on house arrest for the assault at the time he was arrested for the bank robbery. In July 2007, when Olivares was 19 years old, he was found in possession of a firearm, convicted and sentenced to prison. He was serving that prison sentence when the district attorney filed the charges in this case. Olivares testified about his involvement with the Four Trey Gangster Crips and the type of punishment the gang exacts on rivals who come into Gilbert Lindsay Park: "They can get beat up, stabbed, shot . . . ."

Olivares denied involvement in any of the charged offenses. He stated he was not at Gilbert Lindsay Park on April 3, 2004, the date of Carpinteyro's murder (count 1). He testified with particularity about his whereabouts that day and night. He further stated he was not at Gilbert Lindsay Park when Moreno and Olivar were shot (counts 3 and 4), but he did not provide a detailed account of his whereabouts at the time of the attempted murders. In denying his involvement in the May 27, 2004 murder of Johnson, Olivares described Johnson as a "very good friend."

On June 12, 2012, the jury found Olivares guilty of the attempted murders of Moreno and Olivar. The jury deadlocked on the two murder counts and, on June 15, 2012, the trial court declared a mistrial as to those counts. The prosecution retried Olivares and Thompson for the murders. Both defendants were acquitted.

On October 29, 2013, Olivares's counsel filed a motion for new trial, arguing the trial court erred in denying the motion to sever the murder counts from the attempted murder counts. In the alternative, counsel also asserted, even if joinder of the counts was appropriate at the time the court hear the motion to sever, reversal was required nonetheless because the evidence presented at trial demonstrated joinder was unduly prejudicial. The court denied the motion for new trial.

The trial court sentenced Olivares to life with a minimum parole eligibility term of seven years for the attempted murder charged in count 3, plus 25 years to life for the

12

firearm enhancement under section 12022.53, subdivisions (d) and (e)(1). The court stayed the remaining firearm and gang enhancements. The court imposed the same sentence for the attempted murder charged in count 4 and ordered it to run concurrently with the sentence on count 3.

## DISCUSSION

Olivares contends the trial court erred in denying his motion to sever the murder counts from the attempted murder counts, and the error requires reversal. We agree

Under section 954, unrelated offenses occurring at different times may be charged together in the same information if the offenses belong to the same class of crimes. Olivares does not dispute murder and attempted murder are in the same class of crimes. Where, as here, joinder is permissible under section 954, a defendant moving to sever counts "has the burden to clearly establish a potential of prejudice sufficient to warrant separate trials." (*People v. McKinnon*, *supra*, 52 Cal.4th at p. 630.)

A trial court has broad discretion to deny a motion for severance because joinder of counts "ordinarily promotes [judicial] efficiency" and therefore "is the preferred course of action." (*People v. Scott*, *supra*, 52 Cal.4th at p. 469; *People v. McKinnon*, *supra*, 52 Cal.4th at p. 630.) In deciding whether the court abused its discretion in denying the motion, "we examine the record before the trial court at the time of its ruling." (*People v. McKinnon*, *supra*, 52 Cal.4th at p. 630.) "'The relevant factors are whether (1) the evidence would be cross-admissible in separate trials, (2) some charges are unusually likely to inflame the jury against the defendant, (3) a weak case has been joined with a strong case, or with another weak case, so that the total evidence may unfairly alter the outcome on some or all charges, and (4) one of the charges is a capital offense, or joinder of the charges converts the matter into a capital case.'" (*People v. Scott*, *supra*, 52 Cal.4th at pp. 469-470.)

Evidence of the murders would not have been cross-admissible in a separate trial on the attempted murders. The murders, which occurred on different dates from each other and from the attempted murders, involved circumstances very different from each other and from the attempted murders. The prosecution alleged four-year-old Erica

13

Carpinteyro was killed on April 3, 2004, when a bullet intended for a rival gang member struck her in the head as she sat in a vehicle. The prosecution presented evidence demonstrating Moreno and Olivar were shot on May 23, 2004, during a melee between two groups of people at the park. The prosecution alleged Four Deuce/Four Trey gang member Michael Johnson was shot in the head and chest by fellow gang members on May 27, 2004, because he was assisting police in an investigation unrelated to this case. Nothing tied the murders with the attempted murders other than the allegations the offenses were committed for the benefit of, at the direction of, and in association with the Four Trey Gangster Crips and a principal used a firearm. There is no evidence indicating the same firearm was used in multiple shootings.

The Attorney General argues the evidence was cross-admissible to prove intent. We disagree. "To be admissible to prove intent, the charges must be sufficiently similar to support the inference that the defendant probably harbored the same intent in each instance." (*People v. Scott*, *supra*, 52 Cal.4th at p. 471.) Evidence of the facts and circumstances surrounding the Carpinteyro and Johnson murders does not tend to prove Olivares intended to kill Moreno and Olivar during the scuffle in the park. Moreover, we reject the Attorney General's assertion joinder was proper because the gang expert would be called to testify in each separate trial to prove the gang enhancement allegation.

We recognize cross-admissibility of evidence is not a hard and fast requirement for joinder of counts. As set forth in section 954.1, "In cases in which two or more different offenses of the same class of crimes or offenses have been charged together in the same accusatory pleading . . . evidence concerning one offense or offenses need not be admissible as to the other offense or offenses before the jointly charged offenses may be tried together before the same trier of fact." (§ 954.1.) Cross-admissibility of evidence is, however, a factor we consider in determining whether the trial court abused its discretion in denying a motion to sever counts. (*People v. Scott*, *supra*, 52 Cal.4th at p. 469.) Here, the lack of cross-admissibility of the facts and circumstances of the murders weighs in favor of severance of counts.

14

Turning to the second factor, we conclude the murder charges were "unusually likely to inflame the jury against" Olivares. (*People v. Scott*, *supra*, 52 Cal.4th at pp. 469-470.) The murder of a four-year-old child who was shot in the head while she sat inside a car with her brother and father, and the execution-style murder of a fellow gang member who was a snitch, are highly inflammatory when compared with the shooting of Moreno and Olivar in the midst of a scuffle between two groups of people.

Our review of the third factor—whether "a weak case has been joined with a strong case, or with another weak case, so that the total evidence may unfairly alter the outcome on some or all charges" (*People v. Scott*, *supra*, 52 Cal.4th at p. 470)—also weighs in favor of severance of counts. Shortly after the May 23, 2004 shooting of Moreno and Olivar, officers showed eyewitnesses six-pack photographic lineups containing Olivares's photo, but eyewitnesses were unable to identify Olivares as the shooter. As Olivares pointed out to the court in connection with his motion to sever counts, the police report regarding the May 23, 2004 shooting, states the district attorney decided not to file charges against Olivares in July 2004 because the eyewitnesses did not identify him as the shooter. Six years later, the attempted murder charges were filed against Olivares although there were no new witnesses supporting the charges. But the attempted murder charges were not filed alone. They were combined with two murder charges supported by weak evidence (accusations by gang members Travis Hardy and Erica Murray which two juries found insufficient to convict Olivares or Thompson of murder).

Finally, we consider whether one of the charges is a capital offense. Olivares and Thompson were charged with two counts of special circumstance murder. Olivares was a minor at the time of the shootings and therefore not subject to the death penalty. Codefendant Thompson, on the other hand, was an adult and subject to the death penalty. When the trial court ruled on the motion to sever counts, the prosecution had not yet decided whether to seek the death penalty against Thompson. Accordingly, the trial court stated it was treating the case as a capital case at that time.

15

Based on our review of the relevant factors in light of the record before the trial court at the time it denied Olivares's motion to sever counts, we find the court abused its discretion because Olivares had "clearly establish[ed] a potential of prejudice sufficient to warrant separate trials." (*People v. McKinnon*, *supra*, 52 Cal.4th at p. 630.) But even assuming the trial court's denial of the motion was correct when made, we "'still must determine whether, in the end, the joinder of counts . . . resulted in gross unfairness depriving the defendant of due process of law.'" (*People v. Soper* (2009) 45 Cal.4th 759, 783.) Considering the evidence presented at trial, we conclude joinder of counts deprived Olivares of a fair trial on the attempted murder counts for the reasons explained below.

In a separate trial on the attempted murders, fellow gang members Travis Hardy, Erica Murray and Leighton Corothers would not have testified and provided the jury a bird's eye view into the atrocities of gang life. The jury would not have heard about the bank robbery Olivares committed with Corothers and Thompson. It is doubtful Olivares would have testified and disclosed his criminal convictions given the vast majority of his testimony related to the murders and not the attempted murders—describing his whereabouts at the time Carpinteyro was murdered, discussing his relationship with murder victim Johnson and the prosecution witnesses who testified against him regarding the murders (Hardy, Murray, Corothers, and Olea), explaining the relationship between Four Trey and the Avalon gang (the purported target of the April 3, 2004 shooting in which Carpinteyro was killed), etc. After reviewing the trial transcript, we conclude there was a substantial risk the jury convicted Olivares of the attempted murders based on all of the inflammatory evidence it heard in connection with the murder charges—charges which should have been severed before trial. The joinder of counts resulted in gross unfairness depriving Olivares of due process of law. Accordingly, we reverse.[8]

---

[8] Because we reverse Olivares's convictions on this ground, we need not address the other purported grounds for reversal he raises in his opening appellate brief.

## DISPOSITION

The judgment is reversed.

NOT TO BE PUBLISHED.

CHANEY, J.

We concur:

ROTHSCHILD, P. J.

BENDIX, J.[*]

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.