Filed 8/31/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B298637 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. KA112231) |
| v. | |
| NEIL EFREN DELRIO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Bruce F. Marrs, Judge. Reversed.

Brad Kaiserman, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Michael R. Johnsen, Supervising Deputy Attorney General, and Blythe J. Leskay, Deputy Attorney General, for Plaintiff and Respondent.

—————————————

We reverse Neil DelRio's murder conviction because the trial court erroneously excluded significant evidence of the victim's violent character. Unmodified code citations are to the Evidence Code.

## I

We summarize a fatal shootout.

### A

A two-man shootout left one unharmed and the other one dead. DelRio and his cousin Raul Prieto drew on each other in front of a house on a cul-de-sac. Prieto shot his nine-millimeter pistol 15 times but missed every time. DelRio fired his .40-caliber pistol twice. Each bullet hit Prieto. Each was fatal.

#### 1

DelRio was the lone eyewitness at trial. We summarize his testimony.

Around 4:00 p.m. on December 21, 2015, DelRio gave his friend Dustin Beamon a loudspeaker. Prieto was there. The interaction was "normal" and "pleasant."

Around 7:00 p.m. that day, DelRio visited Beamon elsewhere: at Beamon's rented side room, off the main house where the shooting occurred. DelRio went there to deliver some Wal-Mart items to Beamon. DelRio parked on the street and walked to the house. Beamon was with two others and there was some "drug use going on there." DelRio did not see Prieto. DelRio was "[c]learheaded"; he did not drink or take drugs before or during his visit. He stayed for 10 or 15 minutes.

DelRio carried his .40-caliber Glock pistol because he sold drugs and encountered dangerous people. He carried a gun only when he dealt drugs. He did not go to Beamon's house to deal drugs, but planned "a transaction" after he left.

2

DelRio knew his felony conviction made it illegal for him to possess the gun and ammunition.

As DelRio walked back to his car, Prieto was walking towards the house. DelRio was in a hurry and the two did not shake hands or greet each other. Prieto "seemed kind of like upset, maybe bothered." He spoke to DelRio aggressively, saying something like, "[Y]ou don't have time just to say hi to me or anything like that?" or "[Y]ou think you're too good or better than me and whatnot?"

DelRio "told him he's got it all wrong" and said "[i]t was nothing like that . . . ." DelRio was just "in a rush and in a hurry to leave."

Prieto accused DelRio of "acting like that with me lately and brushing me off and trying to, you know, not bother with me or deal with me . . . ."

DelRio told Prieto if Prieto "chose to continue to do the things that he was doing, I didn't want to have no part of it." DelRio could not tell if Prieto was high.

The conversation became hostile.

Prieto drew a semiautomatic handgun, racked a round, and lifted the gun. He stepped towards DelRio. DelRio and Prieto were about 20 feet apart. DelRio was "in fear of [his] life" and acted on impulse.

DelRio drew his own gun and fired once. Prieto fired once in return. DelRio ducked and heard the bullet "whiz by."

Prieto fell or crouched down.

DelRio shot one more time as he was getting in his car. He heard gunshots, but no bullets hit his body. As he drove away, DelRio threw his gun on the floor of the car. Later he sold the gun to a friend.

After the shooting, DelRio went for drinks with friends at a strip club. He kept quiet about what happened. He thought about turning himself in but "didn't know how to go about it" and was "very scared."

2

Officers found 17 cartridge casings at the scene: two .40-caliber casings and 15 nine-millimeter casings. The two .40-caliber casings came from one gun. All 15 nine-millimeter casings came from another gun. The officers found two unfired nine-millimeter bullets in Prieto's cargo shorts.

Near the sidewalk and grass, the officers found "a bag of crystallized substance resembling methamphetamine," a red hat with the letter "P" on it, a blue lighter, and "an orange cap of a syringe." They found no guns.

Two abdominal gunshots killed Prieto. The coroner found a .40-caliber bullet in Prieto's body. Prieto had gunshot residue on both hands, which meant it was possible he had fired a gun.

3

Six people heard the shooting. Their recollections conflicted: they agreed neither on the number of shots fired nor about whether a pause separated the shots into groups.

Police found 17 used casings at the scene, suggesting the shooters fired a total of 17 shots. No earwitness reported 17 shots.

A woman at the scene told a deputy she heard six to 10 gunshots. There was no evidence she mentioned any pauses.

Neighbor Regina Gonzales heard about five pops that sounded like fireworks. She did not mention any pauses.

4

Neighbor Robert Haas told a detective he heard about "five to six shots coming from outside his home." There was no evidence he mentioned any pauses.

Neighbor Yesenia Reyes told a detective she heard nine to 10 shots. There was no evidence she mentioned any pauses.

Neighbor Bea Mancillas told a detective she heard one to two shots, followed by nine to 10 shots.

Neighbor Joe Mancillas heard two sets of gunshots around 7:30 p.m. Mancillas gave different versions of what he heard.

First Mancillas testified there were "[a]bout one or two, three shots" in the first set and "more than four, less than seven" shots in the second set. That is, Mancillas heard a total of between five and 10 shots in this version of events.

According to a police report, Mancillas gave a different account: he told deputies he heard one to two shots followed by a pause, then about 10 rapid-fire shots. In this version of events, Mancillas heard 11 or 12 shots.

After reviewing his past statements, Mancillas testified there were two shots in the first set.

Mancillas was familiar with firearms. He owned guns and shot at a range. Based on his experience, the two sets of gunshots sounded like different calibers. The second set sounded louder than the first.

B

A traffic stop took place two weeks after the shootout, on January 4, 2016.

A deputy stopped DelRio driving on Valley Boulevard. The officer found a backpack on the front passenger seat with 20 to 40 live .40-caliber rounds. Two expended shell casings were in a pocket on the driver's side door. Two cell phones were on the

5

passenger seat.  A sunglass case contained unfired .40-caliber cartridges.  The .40-caliber rounds in the car had similar markings to the .40-caliber casings at the shooting scene.

The car had five bullet holes and two bullet impacts.  Bullets had hit both sides and the rear.  Officers found a fired nine-millimeter bullet inside the rear door on the driver's side.  A white skull sticker covered a bullet hole on the driver's side and another sticker covered a bullet hole above the right rear wheel well.  The rear license plate frame covered a bullet hole.  The brand of the right front tire was different from the brand of the other tires.

DelRio had picked up the car from a body shop three days before the shooting, on December 18, 2015.  At that time, the car had no bullet holes and no license plate frame around the rear license plate.  All four tires were the same brand.  DelRio testified he changed the right front tire the day after the shooting because it "had a slow leak."  He also testified he concealed the car's bullet holes with the license plate frame and the stickers because he was worried about explaining the bullet holes to his mother.

The same gun fired the nine-millimeter bullet found in DelRio's car and the nine-millimeter bullet found at the scene.

DelRio testified both cell phones in the car were his.  Data from one phone placed it near the scene at the time of the shootout.

One phone contained photos of a Glock 22—a .40-caliber handgun—next to a loaded magazine.  An outgoing text message accompanying one of the photos read, "Glock 22, you same Cal as urs."  An outgoing text message at 1:31 a.m. the morning after the shooting read, "My bad rude dog I'll get with you in the

morning okay some shit popped off." Another text message read, in part, "[D]o you know anyone that has tires or hookups for some, I need a tire ASAP I've been on a mission, my shit's showing wires." One of the phones showed several internet searches for tires that would fit DelRio's car. The searches were the night of and morning after the shooting.

One phone showed an internet search two days after the shooting for "On-Scene Video dot TV Valinda Deadly Shooting." A detective ran the same search on his computer and found a story about the shooting in this case.

Officers arrested and questioned DelRio. At trial, DelRio admitted he lied to the officers when he told them he did not have a phone number, did not own the cell phones in the car, and did not put the stickers on the car.

### C

The jury convicted DelRio of second degree murder and found firearm enhancement allegations true under Penal Code section 12022.53, subdivisions (b), (c), and (d). The trial court denied defense counsel's motion to strike or dismiss the enhancements under Penal Code section 12022.53, subdivision (h). The trial court sentenced DelRio to life with the possibility of parole, plus a consecutive 25 years to life for the firearm enhancement under Penal Code section 12022.53, subdivision (d). The court stayed the firearm enhancement sentences under Penal Code section 12022.53, subdivisions (b) and (c).

### II

DelRio argues the trial court erroneously excluded several pieces of evidence under section 1103, subdivision (a). He contends the trial court should have admitted each item of

evidence to prove Prieto previously engaged in violence.  He offered, and the trial court excluded, evidence of the following:

- a shooting Prieto allegedly committed 10 days before the shooting in this case;
- Prieto's past domestic violence;
- Prieto's prior firearm possession convictions;
- Prieto's schizophrenia linked with violent outbursts; and
- methamphetamine in Prieto's blood the night of the shooting.

We focus on the evidence of Prieto's past domestic violence.  The trial court erroneously excluded this violent victim evidence.  The error was prejudicial.  First we describe the error.  Then we weigh the harm.

A

It was error for the trial court to exclude evidence that victim Prieto had a character for violence.  On appeal, the prosecution concedes the trial court's reasoning was erroneous.  The Attorney General attempts to supply an alternative rationale for the mistaken ruling, but this revisionist effort fails.

1

We begin by reviewing the law.

We review evidentiary rulings for abuses of discretion. (*People v. Scott* (2011) 52 Cal.4th 452, 491.)

The general rule bars character or propensity evidence. (§ 1101, subd. (a).)  That is, evidence of people's character is inadmissible when offered to prove their conduct on specified occasions.  (*Ibid.*)  Thus, usually the law prevents you from trying to prove X acted some way because X had a propensity to act that way.  There is a fable about the frog and the scorpion.  It stresses

8

the scorpion will sting, no matter what, because *that is in its nature*.  The character evidence rule bans that kind of evidence.  This rule stops prosecutors, for instance, from introducing defendants' rap sheets to suggest once a criminal, always a criminal.

The character evidence rule has a handful of exceptions.  The pertinent one is the violent victim rule.  (§ 1103, subd. (a)(1).)  This rule allows a defendant like DelRio to try to prove the conduct of a victim like Prieto conformed to his character.  Specifically, this exception allows what is usually forbidden:  it permits DelRio to introduce evidence Prieto had a propensity for violent aggression.  This evidence would aid DelRio's effort to prove that, at the crime scene, Prieto was violently aggressive, which forced DelRio to resort to deadly self-defense.  (E.g., *People v. Wright* (1985) 39 Cal.3d 576, 587 (*Wright*).)

2

DelRio offered to prove Prieto had a propensity for violent aggression with the following evidence.  Police arrested Prieto for domestic violence in March 2012, April 2013, and June 2013.  On March 3, 2012, a woman who lived with Prieto called 911 and told officers Prieto "was schizophrenic, not taking his medication, acting strangely and choked her, and furthermore had a firearm in their bedroom which scared her."  Prieto suffered convictions for the March 2012 and June 2013 incidents.

At an in limine hearing, defense counsel invoked section 1103 in an attempt to gain admission of evidence about the March 3, 2012 incident.  Counsel specifically proposed offering the 911 call and her testimony at trial.  He argued the evidence was "relevant in the context of a self defense as a prior violent

9

act" showing Prieto's "character for turbulence, provokeability, et cetera."

Defense counsel asked the trial court to admit other evidence under section 1103 as well, but stated the most probative incidents were the March 3, 2012 domestic violence incident and a shooting Prieto allegedly committed in 2015. DelRio also argued there was a proper basis for a self-defense jury instruction. Counsel observed, "[I]t seems like the Court may wish to reserve ruling to see if the defendant's testimony will provide that substantial basis [for the self-defense instruction]. And if it does, then I believe that these prior acts are definitely admissible and definitely relevant." The trial court deferred its ruling and noted the two incidents "might be relevant."

At trial, DelRio testified he did not know about Prieto's domestic violence incidents. Defense counsel then offered to have the 911 caller testify about Prieto's domestic violence, even if DelRio did not know about it, because it was "basically evidence of the victim's character for violence which is relevant to who started the escalation towards deadly force." Counsel argued "the jury is entitled to know that Mr. Prieto engaged in this type of force."

The prosecutor argued Prieto's bad acts were irrelevant unless DelRio knew about them, and the court agreed. The court decided DelRio's testimony was a basis for a self-defense instruction, but excluded evidence of Prieto's bad acts because "[i]f he didn't know about it, it did not enter into his decision-making process whatsoever and could not have influenced his analysis of what was happening in front of him."

The trial court's analysis was incorrect by law. DelRio need not have known about Prieto's past bad acts.

DelRio's theory was Prieto's violent character was circumstantial evidence of how Prieto acted at the scene. (E.g., *People v. Castain* (1981) 122 Cal.App.3d 138, 142 [evidence victim officer used excessive force on other occasions admissible as circumstantial evidence of officer's conduct during incident in question] (*Castain*); *Wright*, *supra*, 39 Cal.3d at p. 587 [evidence of victim's previous violent reaction admissible when defendant claimed self-defense in a homicide case]; *Pitchess v. Superior Court* (1974) 11 Cal.3d 531, 537 [deputies' disciplinary records "unquestionably relevant and admissible" as character evidence of deputies' violent tendencies to support defendant's self-defense theory]; *Hinojosa v. Superior Court* (1976) 55 Cal.App.3d 692, 696 [evidence of bigotry or a proclivity for violence on the part of assault victims is admissible where conduct of victims in conformity with their character would tend to exculpate a defendant or mitigate the offense].)

Whether DelRio knew of Prieto's arrests for violence was not germane to this theory. "If this [violent] character was known to the defendant, the evidence tends to show the defendant's apprehension of danger; if it was not known, the evidence nevertheless tends to show that the victim was probably the aggressor." (1 Witkin, Cal. Evidence (5th ed. 2012) Circumstantial Evidence, § 59, p. 437. See also *People v. Shoemaker* (1982) 135 Cal.App.3d 442, 446–447 [where self-defense is raised in a homicide prosecution, evidence of the victim's violent character is admissible to show the victim was

the aggressor]; *People v. Rowland* (1968) 262 Cal.App.2d 790, 797–798 [same].)

California law accords with the national rule. (E.g., McCormick, Evidence (8th ed. 2020) Character of victim in cases of assault, murder, and rape, § 193 ["This line of proof and counterproof openly relies on the victim's tendency to act in accordance with a general trait of character—a violent or a peaceful disposition. Consequently, it does not require proof that the defendant was aware of the victim's violent reputation or acts."].)

4

On appeal, the prosecution concedes the court's reasoning was faulty. But the Attorney General argues the court properly could have excluded DelRio's proposed evidence under section 352. This argument fails. (See *Castain, supra*, 122 Cal.App.3d at pp. 142–144.)

Section 352 gives the trial court discretion to exclude evidence if its probative value is substantially outweighed by the probability its admission will necessitate undue consumption of time or create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.

The Attorney General hypothesizes that, had the court admitted DelRio's evidence about Prieto's violence, the prosecutor merely would have countered with evidence about DelRio's own bad acts, thus negating evidence of Prieto's violent past. The suggestion is admission would have only wasted time.

This argument is misplaced for two reasons.

a

First, this argument underestimates the potential value of DelRio's evidence in this factual context. The probative value of

12

the evidence was high because this factual context is one of uncertainty.

We are uncertain what happened at the scene. We have a gun fight with no independent witnesses and with no motive for a murder. We know both men had loaded guns, both men fired at each other, and DelRio killed Prieto. We know DelRio's version, but a person on trial for murder has a motive to fabricate.

Who drew first? That question is key. If Prieto was first with his hand on a gun, the prosecution would have a hard time disproving DelRio's defense of self-defense, for a man with a gun in hand can be an instant and deadly threat.

The crucial factual question for the jury thus was whether Prieto was the aggressor. The trial court instructed the jury on justifiable homicide in self-defense. Evidence tending to show Prieto by nature was violently aggressive would have been directly on point. The probative value of this evidence potentially was great. Concerns about efficient time management must ebb when evidence directly can advance the search for decisive truth.

b

Second, it would have been an abuse of discretion to exclude this evidence under section 352. The prosecution did not object under section 352. Had the prosecution objected on that basis, the court would have had to engage in balancing to address concerns about undue prejudice or confusing the issues.

Excluding the domestic violence evidence after engaging in a section 352 analysis would have been an abuse of discretion. When a trial court does balance, we review its decisionmaking with deference: the trial judge is in the cockpit, with a clearer view of the whole situation and a better ability to apply practical and timely wisdom. (*People v. Clark* (2016) 63 Cal.4th 522, 572.)

When a proffer contains some proof of high value mixed with other less vital material, it is traditional and proper under section 352 for a trial court to tailor the presentation in a discretionary way. It would have been an abuse of discretion, however, simply to exclude everything.

## B

Under any standard of review, this error was not harmless in this close case. The only eyewitness testified to classic self-defense: DelRio shot after Prieto aggressively racked and aimed a semiautomatic at DelRio. DelRio's testimony was self-serving but fit all physical evidence. The witnesses who heard shots were nearly useless, for none knew whether Prieto or DelRio first raised a gun. No evidence suggested DelRio had a motive to shoot his cousin. DelRio did show consciousness of guilt, but his testimony portrayed him as a dealer in illegal drugs, as a convicted felon who knew he could not legally carry a gun, and as one scared of the law—and his mother's judgment should she learn the truth. DelRio had reasons besides murder to feel guilt.

This error was not harmless. (See *Castain*, *supra*, 122 Cal.App.3d at p. 144.)

We reverse DelRio's conviction without reaching other issues.

14

## DISPOSITION

The judgment is reversed and remanded for further proceedings.


WILEY, J.


We concur:


GRIMES, Acting P. J.


STRATTON, J.